# 15-3885(L)

## 15-3886(XAP)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

FOX NEWS NETWORK, LLC,

*Plaintiff-Appellee-Cross Appellant,*

—against—

TVEYES, INC.,

*Defendant-Appellant-Cross Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK,
CASE NO. 13-CV-5315, HON. ALVIN HELLERSTEIN

---

## BRIEF FOR PLAINTIFF-APPELLEE-CROSS APPELLANT
## FOX NEWS NETWORK, LLC
## [REDACTED]

---

DALE M. CENDALI
JOSHUA L. SIMMONS
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Counsel for Plaintiff-Appellee-
Cross Appellant Fox News
Network, LLC*

June 16, 2016

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Fox News Network, LLC ("Fox") certifies that it is wholly owned by Fox Television Stations, Inc., which is wholly owned by Twenty-First Century Fox, Inc., a publicly traded company.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................1

JURISDICTIONAL STATEMENT ...............................................4

STATEMENT OF ISSUES .........................................................5

STATEMENT OF THE CASE .....................................................5

    A.    Television Industry ....................................................5

        1.    Authenticated Online-Viewing ...........................9

        2.    Website Viewing.............................................10

        3.    Syndication Partners ......................................12

        4.    Clip Sales and Licensing..................................13

        5.    Media Monitoring and Clipping Services...........14

    B.    TVEyes' Media Clipping Service .................................14

        1.    TVEyes' Illicit Access to Television Content ......16

        2.    TVEyes' Content-Delivery Features...................17

        3.    TVEyes' Subscribers .......................................29

        4.    The Content-Delivery Features Are Not
                Limited to Internal Research and Analysis .......31

        5.    Other Sources of Television Content.................37

    C.    TVEyes' Refusal to Stop Using Fox's Content
        without a License ....................................................40

SUMMARY OF ARGUMENT ....................................................40

ARGUMENT .........................................................................42

    I.    TVEYES' CONTENT-DELIVERY FEATURES ARE
        NOT FAIR USE.........................................................42

    A.    Factor One: TVEyes' Use is in Bad Faith,
        Commercial, and Not Transformative.........................45

        1.    TVEyes Used the Works in Bad Faith ...............45

2. TVEyes' Use Is Commercial ................................ 47

3. TVEyes' Use Supersedes Fox's Use .................... 48

B. Factor Two: The Works are Creative ........................... 60

C. Factor Three: TVEyes Made the Works Available in Their Entirety ......................................................... 62

D. Factor Four: The Content-Delivery Features Affect the Market for and Value of the Works ........... 66

1. The Negative Effect of TVEyes' Content-Delivery Features on the Value of and Market for Fox's Content ................................... 69

2. TVEyes Incorrectly Inverts the Factor Four Analysis ................................................................. 77

E. Considerations of the Public Interest Favor Fox News ....................................................................... 82

1. Public Benefits of the News Industry ................. 82

2. TVEyes' Public Benefit Argument Fails ............. 84

II. THE DISTRICT COURT'S ADVISORY OPINION WAS ERROR ................................................................... 87

III. TVEYES' OTHER GROUNDS FOR APPEAL ARE MERITLESS .............................................................. 88

A. TVEyes Acted Volitionally and Directly Infringed Fox's Content ............................................................ 88

B. The District Court Did Not Abuse Its Discretion by Enjoining TVEyes ................................................. 92

CONCLUSION ...................................................................... 95

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) ......................................................... *passim*

*Am. Institute of Physics v. Winstead PC*,
  No. 3:12-CV-1230, 2013 WL 6242843 (N.D. Tex. Dec. 3,
  2013) .......................................................................................... 49

*American Broadcasting Cos. v. Aereo, Inc.*,
  134 S. Ct. 2498 (2014) ............................................................. 88, 89

*Ashcroft v. Mattis*,
  431 U.S. 171 (1977) .................................................................. 87

*Associated Press v. Meltwater US Holdings, Inc.*,
  931 F. Supp. 2d 537 (S.D.N.Y. 2013) ...................................... *passim*

*Authors Guild v. Google, Inc.*,
  770 F. Supp. 2d 666 (S.D.N.Y. 2011) ...................................... 43

*Authors Guild v. Google, Inc.*
  804 F.3d 202 (2d Cir. 2015) ..................................................... *passim*

*Beastie Boys v. Monster Energy Co.*
  87 F. Supp. 3d 672 (S.D.N.Y. 2015) ........................................ 95

*Caldwell Mfg. Co. N. Am., LLC v. Amesbury Grp., Inc.*,
  No. 11-CV-6183, 2011 WL 3555833 (W.D.N.Y. Aug. 11,
  2011) .......................................................................................... 93

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ............................................................. 44, 67, 68

*Cartoon Network, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008) ................................................. 90, 91, 92

*Castle Rock Entm't v. Carol Publ'g Grp.*,
150 F.3d 132 (2d Cir. 1998) ............................................................. 68

*Davis v. Gap, Inc.*,
246 F.3d 152 (2d Cir. 2001) ...................................................... *passim*

*Ecolab, Inc. v. FMC Corp.*,
569 F.3d 1335 (Fed. Cir. 2009) ........................................................ 92

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) .......................................................................... 82

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) .......................................................................... 61

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ................................................................... *passim*

*Herb Reed Enter., LLC v. Florida Enter. Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) .......................................................... 93

*Infinity Broad. Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998) ...................................................... *passim*

*Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.*,
621 F.2d 57 (2d Cir. 1980) ......................................................... 62, 82

*Kamerling v. Massanari*,
295 F.3d 206 (2d Cir. 2002) ............................................................. 93

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2002) ........................................................... 51

*Klinger v. Conan Doyle Estate, Ltd.*,
755 F.3d 496 (7th Cir. 2014) ........................................................... 88

*L.A. News Serv. v. KCAL-TV Channel 9*,
108 F.3d 1119 (9th Cir. 1997) ......................................................... 46

*L.A. News Serv. v. Reuters Television Int'l, Ltd.*,
149 F.3d 987 (9th Cir. 1998) ................................................ 49, 52, 53

*L.A. News Serv. v. Tullo*,
   973 F.2d 791 (9th Cir. 1992) ..................................................... *passim*

*Lamar Adver. of Penn, LLC v. Town of Orchard Park, N.Y.*,
   356 F.3d 365 (2d Cir. 2004) ..................................................... 4

*Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.*,
   415 F. App'x 264 (2d Cir. 2011) ........................................... 87

*My-T Fine Corp. v. Samuels*,
   69 F.2d 76 (2d Cir. 1934) .................................................... 94

*N.Y. Times Co. v. Tasini*,
   533 U.S. 483 (2001)............................................................ 89

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*,
   904 F.2d 152 (2d Cir. 1990) ................................................ 45

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*
   166 F.3d 65 (2d Cir. 1999) ..................................... 48, 49, 77

*NXIVM Corp. v. Ross Inst.*,
   364 F.3d 471 (2d Cir. 2004) ........................................ 45, 46

*Olan Mills Inc. v. Linn Photo Co.*,
   23 F.3d 1345 (8th Cir. 1994).............................................. 95

*Pac. & S. Co. v. Duncan*,
   744 F.2d 1490 (11th Cir. 1984)............................... 49, 78, 79

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
   134 S. Ct. 1962 (2014)....................................................... 93

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
   99 F.3d 1381 (6th Cir. 1996).............................................. 94

*Ringgold v. Black Entm't Television, Inc.*,
   126 F.3d 70 (2d Cir. 1997) ........................................... 67, 68

*Roy Exp. Co. v. Columbia Broad. Sys., Inc.*,
   503 F. Supp. 1137 (S.D.N.Y. 1980)................................... 46

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ........................................................................... 44

*Swatch Group Mgmt. Servs. Ltd. v. Bloomberg*,
  756 F.3d 73 (2d Cir. 2014) ............................................................. 54

*Twin Peaks Prods. v. Publ'ns Int'l*,
  996 F.2d 1366 (2d Cir. 1993) ......................................................... 86

*United States v. ASCAP*,
  599 F. Supp. 2d 415 (S.D.N.Y. 2009) ............................................. 60

*United States v. Broad. Music, Inc.*,
  275 F.3d 168 (2d Cir. 2001) ........................................................... 87

*Video Pipeline v. Buena Vista Home Entm't, Inc.*,
  342 F.3d 191 (3d Cir. 2003) ............................................... 43, 73, 79

*Video-Cinema Films, Inc. v. Lloyd E. Rigler-Lawrence E.
  Deutsch Found.*,
  No. 04-CV-5332, 2005 WL 2875327 (S.D.N.Y. Nov. 2,
  2005)................................................................................................. 71

*Wainwright Sec. Inc. v. Wall Street Transcript Corp.*,
  558 F.2d 91 (2d Cir. 1977) ....................................................... 70, 86

*Walt Disney Co. v. Powell*,
  897 F.2d 565 (D.C. Cir. 1990) ........................................................ 95

*Weissmann v. Freeman*,
  868 F.2d 1313 (2d Cir. 1989) ............................................... 45, 61, 82

*White v. West Publ'g. Corp.*,
  No. 12-CV-1340, 2014 WL 3385480 (S.D.N.Y. July 11,
  2014)................................................................................................. 49

*Worldwide Church of God v. Phila. Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) ........................................................ 69

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275 (2d Cir. 2012) ................................................... *passim*

**Statutes**

17 U.S.C. §107 ................................................................ 45, 60, 62, 66

17 U.S.C. §108(a) ......................................................................... 38

28 U.S.C. §1292(a)(1) ..................................................................... 4

28 U.S.C. §1331 ........................................................................... 4

28 U.S.C. §1338 ........................................................................... 4

**Other Authorities**

5 NIMMER ON COPYRIGHT §14.06[C][2][c] ............................................... 94

U.S. Copyright Office, *Report on the Making Available Right
    in the United States*, at
    http://www.copyright.gov/docs/making_available/making-
    available-right.pdf ............................................................... 89

U.S. Copyright Office, *Report on Orphan Works and Mass
    Digitization* (2015), at
    http://www.copyright.gov/orphan/reports/orphan-
    works2015.pdf ..................................................................... 43

## PRELIMINARY STATEMENT

TVEyes extensively relies on *Authors Guild v. Google, Inc.*, but that opinion noted that Google Books "test[ed] the boundaries of fair use." 804 F.3d 202, 206 (2d Cir. 2015). Google Books identified authorized copies of books and provided carefully limited "snippets" of book text to its users. This Court found Google's copying to be fair use only because of numerous protections that ensured that the short, limited snippets assisted in finding content, rather than delivering it.

TVEyes' service is nothing like Google Books. It goes beyond **finding** authorized copies of television content, and instead **delivers** unlimited, unauthorized, lengthy, seriatim, high-definition video clips to its paying subscribers. Far from mirroring *Google*, these clips are a transparent, effective market substitute, making television programs available online both in real-time and on a delay without requiring cable subscriptions or remunerating television networks. TVEyes intends them to substitute for television networks' existing markets and to be redistributed online and on social media. As its marketing materials state, TVEyes' service can be used to:

- "Watch live TV, 24/7";

- "Play," "edit," and "'download unlimited clips' of television programming in high definition";

- "'[E]mail unlimited clips to unlimited recipients' and 'post an unlimited number of clips' to social media and enjoy 'unlimited storage [of clips] on TVEyes servers'"; and

- "Post clips on Facebook, YouTube, and Twitter on an **unlimited basis**!"

TVEyes' advertising has worked. Its users have posted hundreds-of-thousands of unauthorized copies of television content on the public-facing Internet, and created countless more. As a result, contrary to TVEyes' claim that there has been no "cognizable effect on Fox's actual or derivative markets," TVEyes' service has caused significant harm to Fox's existing and potential future markets for its content. This is not fair use.

TVEyes and its *amici* attempt to excuse TVEyes' distribution by emphasizing TVEyes' keyword-searchable word index with text-based analytics (the "Index"), which allows users to track when and on what channel a particular word was spoken.[1] But this case is not about TVEyes' Index or the copies of Fox's closed captioning used to create it.

---

[1] As TVEyes' *amici* repeat TVEyes' arguments or focus on subjects not at issue, Fox does not address them separately.

- 2 -

Instead, this case is about TVEyes' separate act of copying Fox's audiovisual telecasts 24/7, and its distribution of that content to its customers for watching, downloading, archiving, and redistribution (the "Content-Delivery Features"). These Content-Delivery Features are independent from the Index and go beyond any content distribution previously permitted by search services under the banner of fair use. Blessing them as fair use just because TVEyes also offers the Index would be inconsistent with this Court's precedents and create a loophole through which classic copyright infringement would now be excused.

TVEyes also tries to support its argument by stressing how it believes its subscribers might use its system. As this Court has made clear, however, TVEyes cannot immunize copying all of Fox's programming by pointing to the possibility that a tiny percentage of its subscribers might later make fair uses of some Fox content. Moreover, despite TVEyes' cherry-picked examples of a few entities using its Index for commentary, the Content-Delivery Features were designed for PR and communications professionals, who make up the vast majority of TVEyes' users and to whom TVEyes' marketing materials are directed. These professionals use TVEyes as a source of unlimited, high-

definition video clips, which they distribute and post to social media to promote their clients' appearances and mentions of their products on television. As a result, TVEyes undercuts Fox's well-developed clip licensing market by offering the same clips for less than "traditional clipping services."

As TVEyes' for-profit Content-Delivery Features are substitutive and negatively impact the actual and potential value of and market for Fox's content, they are not fair use. To hold otherwise would allow widespread copying and redistribution of television content (and potentially other types of content) with no justification based in law or fact.

## JURISDICTIONAL STATEMENT

As a copyright case, the district court had jurisdiction under 28 U.S.C. §§1331, 1338. This Court has jurisdiction under 28 U.S.C. §1292(a)(1) because the district court refused to grant a permanent injunction that sufficiently protected Fox's copyrights. [Dkt.184]; *Lamar Adver. of Penn, LLC v. Town of Orchard Park, N.Y.*, 356 F.3d 365, 371 (2d Cir. 2004) ("[R]eview 'extends to all 'matters inextricably

bound up with the [injunction].'").  Fox's cross-appeal is timely as its notice was filed within 14 days of TVEyes' notice.  [Dkt.193.]

## STATEMENT OF ISSUES

1.    Whether the district court erred by concluding that it constituted fair use for TVEyes to copy all of Fox's telecasts and to deliver them in their entirety as unlimited, lengthy, high-definition video clips to paying subscribers through the Content-Delivery Features, given existing and potential markets for such content.

2.    Whether the district court erred by determining that an untested, hypothetical redesign of TVEyes' emailing and sharing features would constitute fair use when it determined that those features did not constitute fair use as actually designed.

## STATEMENT OF THE CASE

### A.   Television Industry

Traditionally, cable television channels, like Fox News Channel ("FNC") and Fox Business Network ("FBN"), make money primarily from two sources.  ***First***, cable, satellite, and other multichannel video programming platforms ("MVPDs") pay Fox per-subscriber carriage fees for the right to include Fox's channels in their subscription packages. [Dkt.56("Carry.Decl.") ¶¶3-8.]  "[T]he more subscribers, the bigger the

- 5 -

carriage fee." [Dkt.86("Sept.2014.Op.").at.9.] ***Second***, advertisers pay Fox for advertisements that appear during commercial breaks on its channels based on viewership determined by Nielsen ratings. [Dkt.152("Simmons.4th.Decl.")Ex.222 (57:4-25); Carry.Decl. ¶7; Sept.2014.Op.9.] The larger the viewership, the higher the advertising rates. [Carry.Decl. ¶18.]

These revenues are used to train skilled journalists, gather news, invest in modern equipment, and maintain news bureaus around the world. [Dkt.44("Berg.Decl.") ¶¶5-31; Dkt.48("Wallace.Decl.") ¶¶29-45; Dkt.100 ("Knobel.Decl.") ¶¶6, 179.] Moreover, when major, unanticipated news occurs, journalists are mobilized on a moment's notice to travel to the story, requiring additional expenditures (including security for dangerous assignments). *Id.* As explained by Fox's journalism expert, Dr. Knobel, the outlays required to create television news total ███████████████ of dollars each year. [Knobel.Decl. ¶182; Berg.Decl. ¶¶3-21; Sept.2014.Op.7.; Dkt.147("Simmons.3d.Decl.")Ex.188 (73:10-74:16, 178:24-179:23); Dkt.55("Simmons.Decl.")Ex.66 (322:13-17).]

As TVEyes' own expert admitted, television news organizations play "a critical role in our society." [Dkt.106("Karle.Decl.") ¶192.] They perform the "vital public service" of "being a 'watchdog' on the government and many other institutions." [Knobel.Decl. ¶¶6, 179.]

The Fourth Estate, however, is in a time of transition and crisis. "[F]ewer people are watching news on television, and more people are watching news online and through social media." [Knobel.Decl. ¶33; Dkt.157("Knobel.2d.Decl.")Exs.133-35; Dkt.146("Ashton.2d.Decl.") ¶6.] Younger consumers "do not watch traditional television," [Simmons.3d.Decl.Ex.186 (40:13-22); Knobel.2d.Decl. ¶4]; they focus on "content in small, easily digestible segments." [Knobel.Decl. ¶36.]

This jeopardizes newsgathering's financial model, [Knobel.Decl. ¶180], resulting in news organizations cutting back on their coverage. [Wallace.Decl. ¶¶9-11, 45; Knobel.Decl. ¶189.] For example, since 1990, "[s]teep revenue and circulation declines" have left "many newspapers struggling" with ad revenue falling "more than 50%." [Dkt.150("Knobel.3d.Decl.")Ex.208.] Similarly, the audience for network evening news broadcasts has shrunk from 52 million in 1980 to 22 million in 2013, resulting in bureau closures, staff layoffs, and less

- 7 -

coverage.  [Wallace.Decl. ¶11.]  Some cable news channels have even stopped covering breaking news.  [Wallace.Decl. ¶45.]

At this critical inflection point, monetizing digital content—especially short clips—has become, as TVEyes' own expert admitted, "essential."  [Simmons.3d.Decl.Exs.188 (63:12-22), 186 (40:13-22); Knobel.Decl. ¶¶180, 189; Dkt.145("Misenti.3d.Decl.) ¶¶4-5.]  "[I]f one wants to make money in news and support a news organization, one should deliver it" digitally.  [Simmons.3d.Decl.Ex.188 (65:4-9).]

Consequently, to support their newsgathering and reporting, television channels monetize their content in "increasingly extensive and diverse" ways.  [Knobel.2d.Decl. ¶4; Sept.2014.Op.7.]  "Every television news organization has a website on which it posts its video clips and other content," from which it earns advertising revenue.  [Knobel.Decl. ¶47.]  Similarly, they earn revenue from the sale and licensing of video clips.  [Knobel.Decl. ¶40.]  The clip licensing market is vast, and licensees use clips for diverse purposes, such as internal use, company presentations, social media posts, and web-based advertising.  [Knobel.2d.Decl. ¶4, 11-15, Ex.144; Simmons.3d.Decl.Ex.188 (162:5-

164:17); Dkt.47("Ashton.Decl.") ¶13; Ashton.2d.Decl. ¶3; Misenti 3d.Decl. ¶¶ 33-44.]

As detailed below, Fox makes "all of its content available to the public digitally" on various platforms. [Knobel.Decl. ¶238.]

### 1. Authenticated Online-Viewing

Fox distributes all of its telecasts on its authenticated online-viewing platform, TVEverywhere. Through this service, "live online streams of FNC and FBN are available to viewers with cable or satellite subscriptions … for authenticated streaming," [Dkt.173("Aug.2015.Op.").at.4], on any computer or mobile device:



[Dkt.49("Misenti.Decl.") ¶9; Dkt.43("Villar.Decl.") ¶29.] Fox also is considering expanding the service to include "past episodes of its previously-aired television programs." [Knobel.Decl. ¶53; Misenti.3d.Decl. ¶25-26.]

Fox earns revenue from authenticated viewing in two ways. *First*, it is a "value add that the cable providers are offering to their

subscribers to help to maintain their businesses" and their ability to pay carriage fees. [Simmons.3d.Decl. Ex.186 (25:5-18).] **_Second_**, TVEverywhere viewers see paid advertising and will be counted in Fox's ratings, increasing that revenue stream. [Villar.Decl. ¶29.]

### 2. Website Viewing

Fox makes its television content available on its website. From the nineteen works asserted in this litigation (the "Works"), Fox created 70 video clips, which were and are available on its website:



[Misenti.Decl. ¶¶12-14.]

Fox's online clips are used for myriad purposes by various users, including for their informative or promotional value, and to criticize and comment on Fox and its coverage. [Dkt.149("Misenti.4th.Decl.") ¶¶9-10, Ex.206-07.] Clips are viewed by corporations and individuals. [Villar.Decl.Ex.6; Misenti.3d.Decl. ¶12.]

Once video clips are posted to Fox's website, visitors can "copy and paste URLs of specific clips," share them "on social media platforms"

(such as Facebook, Twitter, and LinkedIn), or embed Fox's video player on any third-party website or in offline files, such as Word documents or PowerPoint presentations. [Sept.2014.Op.7-8; Misenti.Decl. ¶16; Misenti.3d.Decl. ¶14.] Fox encourages sharing of its clips, as they direct viewers back to its website, thereby increasing its website traffic. [Misenti.Decl. ¶16; Misenti.3d.Decl. ¶14.]

Although these clips are free, Fox earns revenue from them in two ways. [Misenti.Decl. ¶19.] ***First***, "Fox receives advertising revenue when viewers watch videos on its websites, including revenue from banner advertisements on the page itself, and from 'pre-[roll]' advertisements that play before a video clip begins."[2] [Aug.2015.Op.4; Misenti.Decl. ¶¶12-13, 19; Misenti.3d.Decl. ¶9.] High-traffic websites receive more online advertising revenue. [Simmons.Decl.Ex.66 (202:21-25); Misenti.3d.Decl. ¶10.] ***Second***, visitors to Fox's website see promotions for Fox's other digital offerings and upcoming programming, resulting in additional traditional and online viewership. [Misenti.Decl.

---

[2] Fox also receives pre-roll advertising revenue when viewers use its video player on third-party websites. [Misenti.Decl. ¶19.]

¶¶5, 19-20; Misenti.3d.Decl. ¶13-14, 19; Knobel.Decl. ¶¶52-54;
Knobel.2d.Decl. ¶10; Villar.Decl. ¶24, Ex.9.][3]

### 3. Syndication Partners

Fox "licenses third party websites, including Yahoo!, Hulu, and
YouTube, to store and show video clips of segments of its program on
their websites, thereby generating another stream of income by the
license fees Fox News charges." [Sept.2014.Op.8; Misenti.Decl. ¶20.]
These "syndication partners" are licensed to display clips from the
Works. [Misenti.Decl. ¶20; Simmons.3d.Decl.Ex.186 (18:25-21:11);
Misenti.3d.Decl. ¶29.]

Fox also licenses its content for over-the-top delivery (*i.e.*, Fox's
content is available to anyone who purchases a subscription with an
"OTT" service, even if she does not pay for cable television).

---

[3]   Every day, Fox makes ▮▮▮▮▮▮▮ of previously-aired content
available for free as video clips on its website. [Misenti.Decl. ¶13;
Misenti.3d.Decl. ¶7; Dkt.138("Rose.3d.Decl.")Ex.MMMMM (120:8-
13).] While Fox makes all of its content available for authenticated
viewing, *supra* 12, it has not made more of its content available for
free ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ Fox to maintain the balance between the
traditional television audience and the growing digital audience.
[Carry.Decl. ¶¶10-11.] Making all of Fox's content available for free
would destabilize this balance, leaving little incentive for MVPDs to
pay Fox carriage fees.

[Misenti.3d.Decl. ¶¶26-27; Simmons.3d.Decl.Ex.186 (22:20-23)];
http://www.wsj.com/articles/sling-tv-launches-new-multi-stream-version-with-fox-channels-1460550786.

### 4.    Clip Sales and Licensing

Fox licenses the distribution of its "video clips through its exclusive clip-licensing agent, ITN Source, Ltd. ('ITN Source')" and Executive Interviews.  [Sept.2014.Op.8; Misenti.Decl. ¶21-24.]  These services distribute and license Fox clips to myriad entities, including "multinational corporations, small boutique and regional companies, nonprofit organizations, and government entities," [Sept.2014.Op.8; Dkt.46("Williams.Decl.") ¶26], "journalists and politicians," [Aug.2015.Op.4], and public relations and advertising firms. [Williams.Decl. ¶¶7, 27, Ex.25; Ashton.Decl. ¶¶8, 20.]

As ITN Source's Managing Director explained, these clips are licensed "for a variety of uses, including … internal corporate (such as on a company Intranet) … and nonbroadcast (such as promotional display, internal review, and educational)."  [Williams.Decl. ¶7, 26-27; Ashton.2d.Decl. ¶¶7-17 ( █ of Executive Interviews' licenses include internal use), Exs.182-84; Dkt.58("Rose.Decl.")Ex.M; Knobel.Decl.

¶¶141-146; Knobel.2d.Decl.Ex.147.] Clips also are licensed for "digital archive[s]." [Sept.2014.Op.8.]

### 5. Media Monitoring and Clipping Services

Television networks earn revenue from licensing their content to media monitoring and clipping services. For instance, TVEyes licenses the rights to copy, reproduce, distribute, and display television programming. [Simmons.Decl.Exs.120.at.ALLBRITTON0000121, 65 (96:21-98:3), 102-05 §§A.1, B.2, 96 §§1.1, 5.1.] Likewise, "CNN, HLN and ABC News have chosen Critical Mention," a similar company, to license their content, and ITN's content is licensed to others. http://monitor.criticalmention.com/media-monitoring; [Williams.Decl. ¶¶29-30].

### B. TVEyes' Media Clipping Service

"TVEyes is a for-profit company with revenue of more than $8 million in 2013." [Sept.2014.Op.6.] It is—and markets itself as—a "clipping service." [Simmons.Decl.Exs.115.at.TVEYES-037132, 86.at.TVEYES-009606, 108.at.TVEYES-001997, 109.at.TVEYES-038937, 110.at.TVEYES-038909; Dkt.57("Cronin.Decl.") ¶4; Simmons.Decl.Ex.68 (17:11-14, 96:9-16).] TVEyes pitches that it is better than "a traditional clipping service" that charges per-clip,

because the Content-Delivery Features provide unlimited clips for one comparatively low fee. [Simmons.Decl.Exs.108.at.TVEYES-001997, 109.at.TVEYES-038937, 110.at.TVEYES-038909, 111.at.TVEYES-008271.] TVEyes also leads its subscribers to believe that that they are authorized to use TVEyes-created clips for any purpose. [Cronin.Decl. ¶8; Ashton.Decl. ¶¶24-35, Ex.32.at.EI0001684.]

In advertising and describing its service, TVEyes states that, in exchange for $500 a month,[4] users can:

- "[W]atch live TV, 24/7," as well as "play," "edit," and "'download unlimited clips' of television programming in high definition" to "their hard drive or to a compact disk." [Sept.2014.Op.6.]

- The TVEyes User Manual states that TVEyes "allows you to watch live-streams of everything we are recording." *Id.*

- TVEyes also highlights that subscribers can "'email unlimited clips to unlimited recipients' and 'post an unlimited number of clips' to social media and enjoy 'unlimited storage [of clips] on TVEyes servers.'" *Id.*

- 

---

[4] ████████████████████████████████████ [Simmons.Decl.Ex.66 (236:9-16).]

- 15 -

- TVEyes' sales team regularly contacts potential clients that appear on Fox's channels and promotes the Content-Delivery Features by touting the ability to "save clips for use on Facebook, YouTube, and Twitter." [Simmons.Decl.Ex.70 (RFAs 137,139,141); Knobel.Decl.Ex.21.at.TVEYES-037780, TVEYES-036426, TVEYES-036454, TVEYES-037892, TVEYES-036441.]

- In communications with potential customers, TVEyes states, "You can then use the clips in your Public Awareness campaigns! … Post clips on Facebook, YouTube, and Twitter on an **unlimited basis**!" [Knobel.Decl.Ex.21.at.TVEYES-037905.]

- TVEyes' employees actively assist customers in posting clips online. [Knobel.Decl. ¶74.]

- As stated by TVEyes' Vice President of Global Sales, "You can email this clip to unlimited recipients, they can view it unlimited times. ***TVEyes clips are viral, like YouTube!***" [Knobel.Decl.Ex.21.at.TVEYES-038918 (emphasis added).]

### 1. TVEyes' Illicit Access to Television Content

TVEyes records "more than 1,400 television and radio stations, twenty-four hours a day, seven days a week," including Fox's channels. [Sept.2014.Op.2.] These channels are from wide-ranging genres, including news, business, sports, entertainment, education, and local stations. [Simmons.3d.Decl.Exs.189-90.]

TVEyes acquires that content by fraudulently purchasing standard cable and satellite subscriptions as if it were an individual living at a private residence. [Knobel.3d.Decl. ¶10.] It acquires Fox's

content from Comcast, Cablevision, and ImOn,

[Simmons.Decl.Ex.121.Ex.A.at.4], each of which "contractually prohibits

the copying and redistribution of television content." [Knobel.Decl.

¶116; Simmons.Decl.Exs.122, 123, 124; Carry.Decl. ¶12.] By copying

and redistributing Fox's content, TVEyes violates those provisions.

[Knobel.Decl. ¶116; Simmons.Decl.Exs.122, 123, 124; Carry.Decl. ¶12-

13.] Indeed, DIRECTV sued TVEyes after learning that TVEyes had

obtained DIRECTV's services under false pretenses and violated its

contract. [Knobel.3d.Decl. ¶10, Ex.209.] The case settled for

undisclosed terms and the issuance of an injunction prohibiting TVEyes

from using DIRECTV's services in the future. Orders (Dkt.41-42),

*DIRECTV, LLC v. TVEyes, Inc.*, No. 2:15-CV-04364 (C.D. Cal.).

## 2. TVEyes' Content-Delivery Features

TVEyes offers Content-Delivery Features that do not "blacklist

any material."[5] [Simmons.Decl.Exs.64 (319:9-18), 66 (52:2-7).] Instead,

TVEyes copies all television content verbatim in its entirety and makes

---

[5] TVEyes also offers a separate, independent keyword-searchable
Index that is used to generate word counts and analytics data.
[Simmons.Decl.Ex.121.Ex.A.at.4]; TB 10. To operate, the Index
copies closed captioning text that television networks create at great
expense. [Sept.2014.Op.2.]

- 17 -

everything available to its paying subscribers.  [Dkt.12("Answ.") ¶¶1, 30-33, 37; Sept.2014.Op.4-5.]

The Index and Content-Delivery Features involve independent acts of copying (*i.e.*, the Index copies closed captioning text and the Content-Delivery Features copy audiovisual telecasts). [Simmons.Decl.Ex.121.Ex.A.at.4-5, 11 (audiovisual and text files separately created and stored).]  From a technical perspective, TVEyes could offer one without offering the other.  Indeed, TVEyes' Chief Technology Officer admitted that providing the Index does not require copying or redistributing audiovisual content. [Dkt.61("Simmons.2d.Decl.")Ex.125 (69:6-9, 69:22-70:19, 97:4-6, 324:13-17).]  Historically, TVEyes' service only included the Index; the Content-Delivery Features were added later.  [Knobel.Decl. ¶¶198-201]

The Content-Delivery Features include the following capabilities.

### a.    *Watching*

TVEyes distributes video clips for watching on its website in three ways.  ***First***, users can "watch live TV, 24/7, on any station [TVEyes is] recording," [Simmons.Decl.Exs.88, 64 (303:10-19), 66 (117:13-118:13),

83.at.TVEYES-010934, 87.at.TVEYES-044104, 89], using a Video-On-Demand-type list of channels, which link to real-time television content:



[Simmons.3d.Decl. ¶23, Ex.205 (recording showing use).]

***Second***, TVEyes provides a Date/Time-Viewing Feature, "by which users can retrieve video clips of chosen networks according to the date and time slots of the broadcasts." [Aug.2015.Op.3-4.] TVEyes' User Manual and sales team describes it as "TVEyes' DVR feature." [Simmons.Decl.Ex.83.at.TVEYES-010929, 70 (RFAs 101, 131, 133), 83.at.TVEYES-010930, 112.at.TVEYES-036863 ("[U]se your TVEyes like a DVR …."), 114.at.TVEYES-039608 ("Works like a TiVo"); Knobel.Decl. ¶265; Aug.2015.Op.18.] Thus, Dr. Knobel was able to watch a clip of an NFL game on ESPN at a specific date and time:



[Knobel.Decl. ¶266; Simmons.3d.Decl.Ex.194 (recording showing use).]

TVEyes' users have employed this feature to watch *Brooklyn 99*, *Good Morning America*, *The Today Show*, *Extra*, and *Entertainment Tonight*. [Knobel.Decl. ¶268; Cronin.Decl. ¶7.] When a user asked how to obtain an FNC clip from "last night at 10 PM," TVEyes told him to use the "time-date" feature. [Dkt.136("Ives.4th.Decl.")Ex.AAAAA.at.TVEYES-040666-40668.]

**Third**, when the Index is searched by keyword, it links to video clips where the closed captioning contains that word. *See* TB 9-11.[6]

Once content is identified, a 10-minute clip is available to the subscriber, which can be paused, rewound, and fast-forwarded.

---

[6] "TB" is TVEyes' principal brief; *amicus* briefs are cited as "___ Br.," according to lead *amicus*.

[Simmons.Decl.Ex.64 (254:14-21).]  These high-quality clips can be

expanded to fill a user's screen, mirroring watching television:



[Simmons.2d.Decl. ¶8; Simmons.3d.Decl. ¶16, Ex.193 (recording of

use).]

Subscribers can "[p]lay unlimited clips" of this recorded content in

10-minute segments.  [Simmons.Decl.Exs.108.at.TVEYES-001996,

109.at.TVEYES-038936, 110.at.TVEYES-038909.]  Moreover, TVEyes

does not limit the "ability to watch as many consecutive ten-minute

segments as [subscribers] wish," [Simmons.Decl.Ex.66 (45:23-46:16)],

making it simple to watch full programs.  [Knobel.Decl. ¶¶10, 107.]

### b.    *Downloading and Archiving*

Downloading.  Once a clip is identified, a TVEyes user can

"download[] the clip to his computer as a local media file.  The clip can

then be viewed offline, without requiring access to TVEyes' server, and

can be stored permanently." [Aug.2015.Op.15.] Downloading (like all Content-Delivery Features) only takes "a few keystrokes." [Knobel.Decl. ¶¶64-65; Simmons.3d.Decl. ¶¶14-22, Exs.195-204 (demonstrations of features).]

TVEyes admits that it "markets the availability of high quality video clip downloads to its subscribers," [Simmons.3d.Decl.Ex.185 (76:16-21); Simmons.Decl.Ex.111.at.TVEYES-008270], and that an "**unlimited number of digital clips**" may be downloaded for a flat subscription fee. [Simmons.Decl.Ex.87.at.TVEYES-044104.] As of 2013, ████████ downloads had been made, including ████ downloads of Fox's content. [Simmons.Decl.Ex.91-92.]

Archiving. TVEyes also allows and encourages users to "create an archive of their clips," [Simmons.Decl.Ex.66 (58:9-12)], in a "personal digital library on TVEyes' server." [Aug.2015.Op.3.] TVEyes refers to this as an "Online Digital Video Archive" or "Media Center." [Simmons.Decl.Ex.83.at.TVEYES-010934] Its User Manual instructs to "[a]lways save" clips in this manner, because "[t]his will ensure your clip is saved FOREVER!!" [Simmons.Decl.Ex.83.at.TVEYES-010928.] Archived video clips can be watched and downloaded in perpetuity as

TVEyes provides "unlimited storage" and never deletes them, even if a
subscriber terminates its account:



[Knobel.Decl. ¶126; Simmons.Decl.Exs.89, 64 (293:21-294:14),
83.at.TVEYES-010928; Aug.2015.Op.3; Simmons.3d.Decl. ¶¶17-22.]

Whether downloaded or archived (and then downloaded), TVEyes
delivers unlimited, consecutive, "high-definition" video clips of up to 10-
minutes. [Simmons.Decl.Exs.86.at.TVEYES-009607, 70 (RFAs 285,
303, 305), 64 (111:23-112:21, 294:25-295:4).] Due to the clips' length,
TVEyes' CEO admitted that "download[ing] an entire news story" is
"absolutely a capability" of the Content-Delivery Features.
[Simmons.Decl.Ex.66 (54:17-20).] Indeed, one TVEyes clip could
include numerous stories, [Wallace.Decl. ¶30; Simmons.Decl.Exs.70
(RFA 285), 64 (294:25-295:4)], and consecutive clips can be downloaded.
[Simmons.Decl.Exs.70 (RFAs 277, 293), 64 (295:5-15), 87.at.TVEYES-
44104; Knobel.Decl. ¶107; Dkt.75("Seltzer.2d.Decl.") ¶5.]

TVEyes adds "no identifiers" to its clips (whether downloaded or otherwise), "such as watermarks," and the clips "can be shared with and accessed by anyone." [Aug.2015.Op.15; Simmons.Decl.Exs.66 (58:25-59:22), 64 (264:2-4).] Downloaded videos do not contain copyright notices, [Simmons.Decl.Ex.66 (61:4-7)], nor do they contain metadata or date/time codes. [Knobel.Decl. ¶¶67-71; Simmons.3d.Decl. ¶¶15, 19, Exs.197, 202.] "There is also no 'digital rights management' software that limits access rights …." [Aug.2015.Op.15.] Indeed, "TVEyes places no technological restriction on its subscribers' use or distribution of downloaded video clips, nor does it utilize any method of identifying the clip as sourced from TVEyes." [Aug.2015.Op.3; Simmons.Decl.Exs.66 (54:25-55:16), 64 (262:18-263:5).]

### c. *Redistribution*

The Content-Delivery Features are not limited to TVEyes subscribers or "authorized users." [Aug.2015.Op.3.] Links to video clips can be shared "with others by e-mail, allowing the recipients of the link to view the video clip on TVEyes' server through their web browsers." [Aug.2015.Op.2.] URL links also can be shared without using e-mail "through any medium that allows transmission of text,"

[Aug.2015.Op.13], including "social media services, such as Facebook or Twitter," [Aug.2015.Op.3 n.3; Misenti.Decl. ¶29, Ex.63; Simmons.Decl.Exs.70 (RFAs 137, 139, 141, 303, 305), 117.at.TVEYES-037780], or "instant messaging." [Aug.2015.Op.13.] Indeed, TVEyes creates hyperlinks that, according to TVEyes' marketing materials, "become[] available immediately!" to post online or send to anyone for promotional purposes. [Simmons.Decl.Ex.83.at.TVEYES-010928.]

"When a recipient clicks on the hyperlink, the viewer is directed to TVEyes' website, not to the content owner's website, and can watch the video content in high-definition." [Sept.2014.Op.4-5.] "The link is public, meaning the recipient does not need to possess TVEyes login credentials" to access the video. [Aug.2015.Op.13.] For example, entering the following hyperlink into any web browser will allow anyone to watch and download a TVEyes-created, high-definition clip of Fox's content:

> http://mediacenter.tveyes.com/downloadgateway.aspx?UserID=27
> 5209&MDID=2909241&MDSeed=7195&Type=Media

[Simmons.Decl.Ex.82.at.20, 64 (289:21-290:15, 292:23-293:5).]

TVEyes actively encourages "users to … publicly distribute content," [Knobel.Decl. ¶62], including advertising the ability to email

and post an "unlimited number of clips." *Supra* 14. For example, the TVEyes Fact Sheet touts the Content-Delivery Features as "perfect for Twitter campaigns and real time sharing," as well as for "an 'exit package' for your clients." [Simmons.Decl.Ex.88.] Similarly, once clips are downloaded, TVEyes recommends that subscribers "share it, burn it onto a disc, or post [it] on YouTube." [Simmons.Decl.Ex.89.]

In April 2015, Dr. Knobel conducted a search to see whether there were examples of such redistribution. In that snapshot search alone, she identified 140,000 links to TVEyes-created video clips posted on public social media platforms and other websites.[7] [Knobel.2d.Decl. ¶¶19, 24, Exs.154, 159; Knobel.Decl. ¶¶11, 79, Ex.22; *see* Misenti.Decl.Ex.63.] Among numerous others, these include examples of companies using TVEyes-created clips for promotional purposes, including (a) Caffebene, a coffeehouse chain, promoting itself on Facebook using a *Fox & Friends* clip; (b) Sparkly Soul, a fitness headband supplier, posting a TVEyes link on its website to a "shout out" on *Good Morning San Diego*; (c) Interactive Toy Concepts, a toy

---

[7] Dr. Knobel's search underrepresents the number of links because it does not reflect links posted and removed prior to or posted after the search. [Knobel.2d.Decl. ¶¶18-20.]

company, using a TVEyes-created clip of FNC featuring its toy on

Facebook; and (d) Dairy Queen posting to its website a clip from *Conan*

featuring its company:




Happy National Coffee Day!! We got the chance to hang out this morning with Fox News and brighten their day with Latte Art Selfies of the Fox & Friends crew!!!

News clip link:
http://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=b4cbf25c-46be-45c2-a418-22b9bb76ca05

Good Morning San Diego – May 2014

Thanks for the Sparkly Soul Headband shout out Allie Wagner on KUSI News Good Morning San Diego:

http://mediacenter.tveyes.com/downloadgateway.aspx?
UserID=187222&MDID=3647467&MDSeed=1130&Type=Media

ublog.com/media/                     Rock 'n' Roll San Diego Marathon & 1/2 Marathon

 **Interactive Toy Concepts Ltd.** · 223 like this
November 30, 2012 at 10:28am ·

Special thank you to our friend Jackie for being so great! Check out our WiSpi Intruder on Fox this am. http://s3.amazonaws.com/TVEyesMediaCenter/UserContent/206458/1351289.4180/FNC_11-30-2012_05.51.19.mp4

**DQ on Conan**

Aug. 9, 2012

http://mms.tveyes.com/Transcript.asp?StationID=3525&DateTime=8%2F10%2F2012+1%3A49%3A08+AM&Term=Dairy+Queen&PlayClip=TRUE

[Knobel.Decl. ¶81.]  Moreover, Dr. Knobel identified over 3,500 Tweets

posted in one year that were still available on Twitter linking to

TVEyes-created clips, including:



[Knobel.2d.Decl. ¶¶21-24.]

In addition to public posting, TVEyes-created clips have been

distributed via e-mail, websites that prohibit inclusion in Google's

search results (such as company intranets and websites employing the

Robots Exclusion Protocol), and using downloaded clips.

[Knobel.2d.Decl. ¶¶18-20.]  Non-public facing redistribution of TVEyes-

created clips is hard to detect because Internet search results do not

include it and TVEyes does not make the clips identifiable.  *Supra* 24.

Nevertheless, Dr. Knobel identified numerous examples.

[Knobel.Decl.Exs.23, 24, 25.]  Indeed, Fox has received hundreds of

"mass e-mails to large distribution groups" that use TVEyes-created

clips as promotional tools.  [Knobel.Decl. ¶81.]

### d. Delivery to Other Media Clipping Services

In addition to distributing Fox's content to TVEyes subscribers,

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

[Simmons.Decl.Exs.97-101, 66 (227:9-21, 228:8-11).] ████████████

██████████████████████████████ *Id.* ████████████████

█████████████████████████████████████████

██████████████████████

## 3. TVEyes' Subscribers

████ of TVEyes' subscribers ████████████████ are for-profit corporations. [Knobel.2d.Decl. ¶¶29.] ████████████ of TVEyes' subscribers are journalism organizations. [Knobel.2d.Decl. ¶29.]

Regardless of the subscribing entity, TVEyes' actual users are ████████████ public relations and communications professionals. ████ PR organizations are listed as TVEyes customers. [Knobel.2d.Decl. ¶¶29-30; Simmons.Decl.Ex.119.] Additionally, at non-PR companies, TVEyes subscriptions often were purchased by or for their **PR teams**. [Knobel.2d.Decl. ¶30-36.] For example, although TVEyes claims use by governmental organizations, at the White House, it was the public

- 29 -

communications team that used TVEyes. [Karle.Decl.Ex.4; Knobel.2d.Decl. ¶33.] Likewise, Dr. Knobel uncovered Defense Department correspondence showing that the service was used by the Department's PR staff. [Knobel.2d.Decl. ¶34.] Indeed, of the active TVEyes subscribers referenced in the district court's 2014 opinion, [Sept.2014.Op.5], *every* subscription was purchased by a PR team. [Knobel.2d.Decl. ¶¶35-36.]

These findings are consistent with TVEyes' advertising of the Content-Delivery Features for external, PR campaigns. A TVEyes Fact Sheet explains that all of the service's "primary uses" are for PR and other business-related purposes, such as "Social Media Campaigns" and "Exit Packages for Clients." [Simmons.Decl.Ex.88.] *None* of the primary uses mention scholarship, criticism, or commentary. *Id.* It goes on to explain that "[c]ontent can be accessed minutes after it airs, making [TVEyes] perfect for Twitter campaigns and real time sharing." *Id.*; [Simmons.Decl.Ex.89.] Additionally, TVEyes "encourages its clients and potential clients to distribute video clips on YouTube, Facebook, Twitter, and other social media websites and is aware that they do so." [Knobel.Decl. ¶74.]

### 4. The Content-Delivery Features Are Not Limited to Internal Research and Analysis

TVEyes asserts that it limits use of its service to "research purposes internal to the subscriber's business." TB 8. That suggestion is absurd. TVEyes' marketing materials show that the Content-Delivery Features are designed for external, promotional use, *supra* 14, resulting in substantial Internet and social media distribution. *Supra* 26. Clearly, TVEyes' subscribers do not believe their use is limited in this way.

Moreover, TVEyes' CEO admits that TVEyes' definition of "internal" encompasses obvious external public use, such as "a PR firm sharing a video with one of its clients." [Knobel.Decl.Ex.37 (198:5-9, 205:20-206:2, 208:14-18, 211:8-12).] Similarly, "a sitting congressman," who "has significant reach across the United States," may use clips for any purpose. [Knobel.Decl.Ex.37 (199:11-19, 200:13-16, 208:6-11; 241:2-10).] And a journalist, whose job is to create public reports, could use the features "as part of their reporting." [Knobel.Decl.Ex.37 (399:17-24).]

TVEyes also lists five "limits" that it allegedly places on its subscribers' use, TB 8, but TVEyes is merely selling snake oil to this Court:

**First**, TVEyes states that "subscribers must physically sign a User Agreement that restricts any use of clips obtained through TVEyes to internal purposes only." *Id.* They do no such thing. This agreement—which, contrary to TVEyes' description, is a "Licensing Agreement" (not a "User Agreement")—does not mention clips at all. [Ives.Decl.Ex.A.] Instead, it references "data" which, as TVEyes' own expert admitted, is not "content." [Simmons.3d.Decl.Exs.188 (125:18-126:9, 208:24-209:17), 191, 192; Knobel.Decl. ¶114.] It is best understood to refer to the analytical data TVEyes procures from third-party sources. [Knobel.Decl. ¶115.] Given that TVEyes promotes the Content-Delivery Features for posting clips on social media, it would make no sense to interpret TVEyes' agreement "to limit" external use.

Even if the agreement said what TVEyes suggests, it takes *chutzpah* for TVEyes to rely on it when TVEyes openly violates its cable subscriptions. *Supra* 16. Further, there is no evidence that each TVEyes user has seen the agreement, as it is signed by only a single

person at each subscribing company, often in its Finance Department. Even if actual users saw the agreement, TVEyes' expert admitted that "every user agreement is written … on the assumption that nobody reads them."  [Simmons.3d.Decl.Ex.188 (130:7-22, 131:13-14).]

*Second*, TVEyes states that "when a subscriber downloads a clip, TVEyes displays a warning."  TB 8.  That is wrong.  The so-called "warning"—which is a small, non-descript text block—only appears on one obscure TVEyes webpage: a Media Download page that the TVEyes User Manual describes as "Outdated." [Simmons.Decl.Ex.83.at.TVEYES-010928.]  Most users downloading clips would never see that page because, instead of using the Media Download Page, TVEyes directs them to "Always save to Media Center!" *Id.*  From the Media Center, users can watch, download, and redistribute video clips ***without ever seeing TVEyes' alleged "warning"***:



[Simmons.Decl.Ex.83.at.TVEYES-010928; Knobel.Decl. ¶¶123, 126; Simmons.3d.Decl. ¶¶20, 25, Ex.203 (recording depicting downloading from archive).]

Even if a user did stumble upon the "Outdated" download page, she is unlikely to see TVEyes' "warning" because she would need to scroll down to do so, which is not necessary to complete the download:



[Knobel.Decl. ¶124; Simmons.3d.Decl. ¶15, Ex.196 (recording depicting download).] Even then, a user does not need to click on or accept these terms before being permitted to download.

**_Third_**, TVEyes states that its "customer service staff remind[s] subscribers that clips obtained through TVEyes may be used only for internal review, research and analysis." TB 8. What TVEyes means is

that its employees allegedly include such a "message at the footer of their emails." [Ives.Decl. ¶8, Ex.C.] The idea that a footer at the bottom of an email would serve as a limit on TVEyes' users, particularly as TVEyes' marketing materials say the opposite, is farcical. *Id.*; *supra* 14; [Knobel.Decl. ¶128.] Even if that were not the case, such footers are rarely used by TVEyes' employees. Notably, even TVEyes' CEO does not include one in his e-mails with potential customers. [Simmons.2d.Decl.Ex.129.] In fact, TVEyes' employees provide clips to subscribers with no indication that external posting is impermissible. [Knobel.Decl. ¶74, Ex.21.at.TVEYES-039745-46.] Moreover, the footer only would appear in the rare instance that a user emailed a representative, which is unlikely as the Content-Delivery Features operate without interacting with TVEyes' staff. [Knobel.Decl. ¶130.]

*Fourth*, TVEyes states that its "'circuit breakers' prevent subscribers from playing or downloading multiple consecutive clips, and from widely disseminating clips." TB 8-9. These "circuit breakers" were a belated, made-for-litigation afterthought that TVEyes created in tacit recognition that its users have employed the Content-Delivery Features

as intended: for mass distribution of television content. They are poorly

designed and ineffectual.

As to preventing watching and downloading consecutive clips, that

███████████████████████████████████████████████

████, [Seltzer.2d.Decl. ¶7], long after TVEyes copied the Works, nearly

a year after this lawsuit was filed, and **after** fact discovery closed.

[Dkt.1("Compl."); Wallace.Decl. ¶¶26-28; Dkt.194("Hr'g.Tr.") (35:18-22).]

███████████████████ ██████████ █████████████████

███████████████████████ [Seltzer.2d.Decl. ¶7; Knobel.Decl.

¶132.] █████████████████████████████████████████

████████████ [Knobel.Decl. ¶133.]

As to wide dissemination, the district court found that TVEyes'

"circuit breaker" designed mid-summary-judgment-briefing (after Dr.

Knobel filed her report showing mass distribution of TVEyes-created

clips) to "block users from viewing videos that are accessed through

social media sites such as Facebook and Twitter" was "ineffective."

[Aug.2015.Op.15 n.6; Knobel.3d.Decl. ¶¶12-14.] ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████ [Dkt.137("Seltzer.4th.Decl.") ¶16.]

TVEyes' other "circuit breakers" are similarly "ineffectual," ██████

████████████████████████ ███████████ ██████ [Knobel.Decl.

¶¶135-38.]

**Fifth**, TVEyes claims that, "when subscribers ask to publicly

display clips, TVEyes directs them to the broadcaster for permission."

TB 9. This claim is contrary to TVEyes' marketing materials and

meaningless as the Content-Delivery Features do not require contacting

TVEyes. *Supra* 14. Even in the rare circumstance that TVEyes did

mention contacting a television network to a subscriber, it neutralized

any "limit" by simultaneously providing the subscriber tools to post

clips online, obviating the need to contact the copyright owner.

[Knobel.Decl. ¶74, Ex.21.at.EOUT004695.]

### 5.   Other Sources of Television Content

While TVEyes portrays itself as unique, there are numerous other

ways to obtain television content. **First**, telecasts can be recorded using

DVRs or more sophisticated recording technology. [Knobel.Decl. ¶¶240-

41.] For example, Volicon offers a product that "captures content

directly from a cable or satellite transmission and indexes it, which

- 37 -

allows users to search for content using closed captioning, review it, and create video clips from it." [Knobel.Decl. ¶243.] Unlike TVEyes, however, customers must have an MVPD subscription entitling them to access television programming before using Volicon's product. [Knobel.Decl. ¶246.]

***Second***, under 17 U.S.C. §108(a), Congress sanctioned archives and libraries to reproduce and distribute copies of news programs for noncommercial purposes under certain circumstances. As TVEyes' own *amici* admit, there are a number of libraries and organizations that make use of this provision. Internet Archive Br. 21.

For example, the Internet Archive created the TV News Archive to collect, preserve, and provide television news reports to the public. [Knobel.Decl. ¶247.] Using the Archive, users can search for telecasts by keyword and watch video clips:



[Knobel.3d.Decl. ¶23, Ex.218.]

The Archive's clips are only "60-second segments" and cannot be downloaded. [Knobel.Decl. ¶19, 248.] If someone wants a full program, the Archive will provide a DVD, but it has to be returned within 30 days. [Knobel.Decl. ¶249.] And the Archive includes clear and conspicuous copyright notices on its website and the DVDs. *Id.*

Similarly, Vanderbilt University has maintained a Television News Archive since 1968, which was established "to capture and index television news broadcasts to make them available to researchers and to preserve them for posterity." [Knobel.Decl. ¶¶253-60.] The Vanderbilt archive permits users to borrow DVDs of entire television programs. *Id.*

- 39 -

### C.  <u>TVEyes' Refusal to Stop Using Fox's Content without a License</u>

"TVEyes admits … that it copies, verbatim, each of Fox News' registered works." [Sept.2014.Op.11.]  Yet, it does not have a license from Fox.  [Carry.Decl. ¶17.]  TVEyes approached Fox for a license, and Fox declined.  [Dkt.45("Steinberg.Decl.") ¶4.]  Fox made multiple requests that TVEyes stop using Fox's content.  [Steinberg.Decl. ¶¶8, 10; Compl.Ex.B.; Simmons.Decl.Ex.85.at.TVEYES-009560.]  TVEyes repeatedly represented to Fox that it would remove the content but never did as promised, even after Fox informed TVEyes of its exclusive licensing arrangement with ITN Source.  [Steinberg.Decl. ¶¶8-11; Simmons.Decl.Ex.66 (88:16-20).]  Thus, Fox had no choice but to bring this lawsuit.

### SUMMARY OF ARGUMENT

**I.**  None of TVEyes' Content-Delivery Features constitute fair use.  ***First***, the purpose and character of TVEyes' use does not justify its copying Fox's content to create the Content-Delivery Features.  TVEyes does so in bad faith by telling falsehoods to access Fox's content and redistributes that content in violation of TVEyes' MVPD subscriptions, its promises to Fox, and industry practices.  It does so for direct

commercial advantage. And the Content-Delivery Features directly substitute for the services that Fox provides; they are not transformative. ***Second***, Fox's Works are creative. ***Third***, TVEyes made the Works available in their entirety. ***Fourth***, TVEyes' use, particularly were it to become widespread, affects the value of and market for television content, including Fox's, resulting in diversion and lost sales, as well as harm to potential future markets. ***Finally***, the public benefit from newsgathering and creating content outweighs any benefit provided by the Content-Delivery Features, particularly when non-infringing alternatives are considered.

The district court issued two summary judgment decisions and entered a permanent injunction. It erred by finding that the features that distribute clips to be watched after keyword searches and archived are fair use. That decision should be reversed.

Conversely, it did not err by finding that the features that distribute clips to be downloaded, emailed, shared, and watched using the Date/Time-Viewing Feature are not fair use. Thus, TVEyes' appeal should be denied.

**II.** The district court erred by issuing an impermissible advisory opinion as to how TVEyes' emailing and sharing features could be redesigned to constitute fair use.

**III.** TVEyes' other grounds for appeal are misplaced. TVEyes' eleventh-hour volitional conduct defense fails. TVEyes itself reproduces, distributes, and performs Fox's content purposefully and volitionally and, thus, is liable for direct copyright infringement.

Additionally, the district court did not abuse its discretion by enjoining TVEyes' use of all of Fox's content and not just the nineteen Works. The injunction was supported by a full record, factual findings, and the serious threat of TVEyes' continuing infringement of Fox's content.

## **ARGUMENT**

## I. **TVEYES' CONTENT-DELIVERY FEATURES ARE NOT FAIR USE**

In mass digitization cases (like this), courts draw a line between services that ***find*** authorized copies of copyrighted works and those that ***distribute*** unauthorized copies of the works. *Compare Google*, 804 F.3d at 218 (service fair use where purpose was "identifying books") *with Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998)

- 42 -

(service not fair use where purpose was "retransmission" of broadcasts). The former can constitute fair use if carefully crafted not to affect the copyright holder's market. The latter is never fair use.

Thus, a keyword-search service that identifies books can provide small segments of text to confirm that a book is responsive to the user's query if the "text is limited, and the revelations do not provide a significant market substitute." *Google*, 804 F.3d at 229. A service that "does not improve access to authorized [works]," however, may not "index[] and display[] unauthorized copies of copyrighted works." *Video Pipeline v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 199 (3d Cir. 2003).

Indeed, the Copyright Office carefully studied this issue and concluded that "there is broad agreement that no colorable fair use claim exists [for] providing digital access to copyrighted works in their entirety." *Report on Orphan Works and Mass Digitization* (2015), at 101, http://www.copyright.gov/orphan/reports/orphan-works2015.pdf. Counsel for Google, Inc., one of TVEyes' *amici*, even acknowledged in *Authors Guild v. Google, Inc.*, that "Google would not have tried to defend digitizing and selling entire books." 770 F. Supp. 2d 666, 678

n.11 (S.D.N.Y. 2011). The district court agreed: "Google would have no colorable defense to a claim of infringement based on the unauthorized copying and selling or other exploitation of entire copyrighted books." *Id.* at 678.

TVEyes asks this Court to break with this consensus. Doing so would be contrary to the law and ignore the facts in this case. Indeed, because the Content-Delivery Features deliver all of Fox's telecasts to TVEyes' subscribers and facilitate redistribution, TVEyes distributes far more content than prior media clipping services that were found not to be fair use. *Infra* 48.

This Court reviews "the district court's fair use conclusion *de novo.*" *Infinity*, 150 F.3d at 107. The four fair use factors are "to be explored, and the results weighed together, in light of the purposes of copyright."[8] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). Those purposes being "to motivate the creative activity of authors … by [providing] a special reward," *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984), and to ensure

---

[8] Fox agrees that the district court erred by applying an "integralness" test instead of considering whether the Content-Delivery Features are fair use. TB 25.

that copyright owners receive "a fair return for their labors."  *Harper &*
*Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985).

In considering the factors, it should not be overlooked—
particularly as TVEyes fails to address it in its brief—that ***the burden
is on TVEyes*** to prove that its copying of Fox's programming
constitutes fair use.  *See Google*, 804 F.3d at 213.  TVEyes cannot meet
its burden.

## A. <u>Factor One: TVEyes' Use is in Bad Faith, Commercial, and Not Transformative</u>

TVEyes cannot meet its burden under the first fair use factor,
which considers "the purpose and character of the use."  17 U.S.C.
§107(1).

### 1. TVEyes Used the Works in Bad Faith

TVEyes tellingly omits any mention of the propriety of its conduct,
even though the cases it cites explain that doing so is "an integral part
of the analysis."  *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471 (2d Cir.
2004); *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152,
160 (2d Cir. 1990); *Weissmann v. Freeman*, 868 F.2d 1313, 1323 (2d Cir.
1989); *see also Harper*, 471 U.S. at 562.

Here, three independent grounds show that TVEyes acted in bad faith. ***First***, TVEyes illicitly accessed the Works through cable subscriptions that expressly prohibit the copying and redistribution in which it is engaged. [Aug.2015.Op.2]; *supra* 16. It accesses television content by fraudulently signing up for MVPD subscriptions ostensibly as individuals intending to use the subscriptions for personal use. *Id.* Thus, TVEyes' use violates the law and breaches its contracts. [Knobel.Decl. ¶116; Simmons.Decl.Exs.122, 123, 124.] Obtaining a work illicitly and in breach of agreements constitutes bad faith and weighs against fair use. *Harper*, 471 U.S. at 563; *NXIVM*, 364 F.3d at 478 (bad faith to use work knowing access was "violation of law or breach of duty").

***Second***, TVEyes' continued use of Fox's content after being refused a license (particularly given its reneging on promises to desist), *supra* 40, constitutes bad faith. *See L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997). ***Third***, TVEyes' conduct violates the accepted industry practice of obtaining licenses to use television content. *Supra* 14; *see Roy Exp. Co. v. Columbia Broad.*

- 46 -

*Sys., Inc.*, 503 F. Supp. 1137, 1146-47 (S.D.N.Y. 1980), *aff'd*, 672 F.2d 1095 (2d Cir. 1982).

### 2. TVEyes' Use Is Commercial

TVEyes' use is commercial, which weighs against fair use. *See Harper*, 471 U.S. at 562; *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 921-22 (2d Cir. 1994). TVEyes is a for-profit, commercial enterprise. [Sept.2014.Op.6; Dkt.70("TVEyes.Resp.SUF.") ¶¶227-231, 235; Simmons.Decl.Exs. 93, 66 (226:24-227:8, 228:2-7).] It copies Fox's content 24/7, [Sept.2014.Op.2], and distributes it to paying subscribers using the Content-Delivery Features, which are central to its sales efforts. *Supra* 14.

Fox's channels are particularly important to TVEyes' commercial business. [Sept.2014.Op.6; *supra* 14; Simmons.Decl.Exs.70 (RFAs 115, 117), 86.at.TVEYES009610.] FNC is one of TVEyes' most viewed and downloaded channels, representing ███ of watched content and █████ ███████ of downloaded clips. [Simmons.Decl.Exs.70 (RFAs 386, 399), 90-91; TVEyes.Resp.SUF. ¶224.] TVEyes also "prioritizes" FNC and FBN and characterizes them as "'must have' TV content,"

[Simmons.Decl.Exs.66 (63:9-13, 100:11-16), 84], and among its "top four high priority stations." [Simmons.Decl.Ex.75.]

### 3.   TVEyes' Use Supersedes Fox's Use

Circuit courts consistently find that services like the Content-Delivery Features are not transformative.  In *Infinity*, this Court considered a service that allowed paying subscribers to "listen over the telephone to contemporaneous radio broadcasts in remote cities."  150 F.3d at 106.  It held that the service was not transformative because the "retransmissions leave the character of the original broadcasts unchanged" with "neither new expression, new meaning nor new message."  *Id.* at 108; *see also Associated Press v. Meltwater US Holdings, Inc.*, 931 F. Supp. 2d 537, 552-56 (S.D.N.Y. 2013) (there "is nothing transformative about" a service that "use[d] its computer programs to automatically capture and republish designated segments of text from news articles, without adding any commentary or insight").

Likewise, in *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, this Court held that a service that "gathered news articles from a variety of sources" and distributed "abstracts" or "rough translations" to

customers was "not in the least 'transformative.'" 166 F.3d 65, 69, 72 (2d Cir. 1999).

Similarly, the Ninth Circuit has twice rejected fair use arguments involving services that copied "television news programs" and delivered the copies to "interested individuals and businesses." *L.A. News Serv. v. Tullo*, 973 F.2d 791, 792 (9th Cir. 1992); *see also L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987 (9th Cir. 1998). As explained by the Ninth Circuit, delivery without "explain[ing] the footage, edit[ing] the content of the footage, or includ[ing] editorial comments" is "not transformative." *Id.* at 993.

Finally, the Eleventh Circuit held that it is not fair use to distribute recordings of television news to the subjects of the reports, even if the copyright holder did not make similar recordings available and the recordings were "for personal use only." *Pac. & S. Co. v. Duncan*, 744 F.2d 1490, 1493, 1495 (11th Cir. 1984).[9]

---

[9] TVEyes mischaracterizes the unreported, district court cases on which it relies to show that its emailing feature is transformative. TB 31. *White v. West Publ'g. Corp.* does not hold that emailing or downloading are transformative. No. 12-CV-1340, 2014 WL 3385480, at *2 (S.D.N.Y. July 11, 2014). *Am. Institute of Physics v. Winstead PC* only found that "if articles submitted to the USPTO [in prosecuting patents] are attached to USPTO filings and

### a. *TVEyes' Content-Delivery Features Are Not Transformative*

TVEyes' Content-Delivery Features, like other clipping services before them, are substitutive, not transformative. Television content is created for various purposes, including: (1) viewing on television and through authenticated viewing, *supra* 5, 9; (2) watching as online video clips on television companies' websites and those of their partners, *supra* 10, 12; and (3) for the sale and licensing as video clips for different uses, *supra* 13, 14.

TVEyes replaces each of these services. It allows subscribers to "watch live TV, 24/7," [Sept.2014.Op.6]; *supra* 18, and to use a "DVR" or "TiVo" equivalent. [Simmons.Decl.Exs.83.at.TVEYES-010929, 114.at.TVEYES-039608]; *supra* 19. It delivers "unlimited clips" to "play," "download," "email," and "post … to social media." [Sept.2014.Op.6.] The result: 140,000 clips online at just one moment in time. *Supra* 26. And as its advertising and customers explain, it is a media "clipping service" that considers itself better than "a traditional

---

correspondence," it would be fair use to send "subsequent copies of the USPTO writings … to clients." No. 3:12-CV-1230, 2013 WL 6242843, at *6 (N.D. Tex. Dec. 3, 2013). The Content-Delivery Features are not used to prosecute patents.

clipping service" that charges per-clip, because of its all-you-can-eat business model. *Supra* 14; [Simmons.Decl.Ex.108.at.TVEYES-001997.]

That TVEyes serves as a substitute for Fox is not accidental. TVEyes deliberately designed its service to allow users to "watch live TV," and encouraged "users to archive, download, and publicly distribute content without limitation." [Knobel.Decl. ¶62]; *supra* 21. TVEyes' fact sheets and sales team actively promote such use to existing and potential subscribers. [Simmons.Decl.Exs.88-89]; s*upra* 15; *see Meltwater*, 931 F. Supp. 2d at 552 (marketing materials conveyed intent to substitute).

TVEyes' Content-Delivery Features constitute classic substitution. In *Infinity*, this Court held that there was "no transformation" in a monitoring service that retransmitted radio leaving "the character of the original broadcasts unchanged." 150 F.3d at 108. In *Texaco*, it held that copying "for the primary purpose of providing numerous [individuals] each with his or her own personal copy of [a work] without … having to purchase" access to the work "merely supersedes the objects of the original creation." 60 F.3d at 919-20. Even *Kelly v. Arriba Soft Corp.*, on which TVEyes relies, noted that "reproducing

news footage into a different format does not change the ultimate purpose of informing the public about current affairs." 336 F.3d 811, 819 (9th Cir. 2002). TVEyes' Content-Delivery Features are not transformative.

### b. *TVEyes' Reliance on Its Subscribers' Uses Is Misplaced*

TVEyes attempts to misdirect this Court by repeatedly highlighting the purposes for which its subscribers (not TVEyes) allegedly use the Content-Delivery Features. TB 28-36. TVEyes' reliance on its subscribers' use is legally irrelevant, and its characterization of such use is factually incorrect.

***First***, the law is clear that TVEyes must defend its own 24/7 copying and distribution of Fox's content; it cannot rely on uses made by its subscribers. The defendant in *Infinity* made the argument TVEyes advances, and this Court held that **the defendant's "own retransmission of the broadcasts"** must be transformative, "not the acts of his end-users." 150 F.3d at 108. Thus, the defendant's selling "access to unaltered radio broadcasts" was not transformative. *Id*. Similarly, while the defendants in *Tullo* and *Reuters* argued that their services were used "for 'research, scholarship and private study,'"

including by journalists, the Ninth Circuit, held that "the ultimate use to which the customer puts the [copy] is irrelevant." *Tullo*, 973 F.2d at 797; *see Reuters*, 149 F.3d at 993-94 (holding that service that was "cop[ying plaintiff's news] footage and transmit[ting] it to news reporting organizations" could not rely on its subscribers' use).[10]  To hold otherwise would vastly complicate copyright lawsuits by requiring plaintiffs to take invasive discovery of each user to determine how they use defendants' systems.[11]

For the same reasons, TVEyes' assertion that it benefits from a presumption because its subscribers supposedly used the service for purposes listed in the fair use statute (*e.g.*, commentary, newsgathering), TB 26, 28, is wrong.  S*upra* 52.  Again, the relevant

---

[10]  TVEyes' reliance on *Google* to suggest that its users' purposes are relevant to transformativeness is misplaced as TVEyes cites the wrong section of the opinion.  TB 28 (citing 804 F.3d at 220, which considers factor two).  The correct section properly focuses on Google's purpose of "identifying books."  *Google*, 804 F.3d at 218.

[11]  TVEyes objected to providing details about its subscribers, even removing identifying information about them from its Activity Log. [Dkt.151("Cendali.2d.Decl.") ¶3.]  Moreover, prior to summary judgment, the district court held that, TVEyes' subscribers' activities were not relevant and that, if they were, Fox "would want to take every customer's deposition and [TVEyes doesn't] want that." [Hr'g.Tr. (27:2-16).]

focus is on TVEyes' use and TVEyes admits that it is neither a

newsgathering organization, nor in the business of gathering or

reporting the news, and does not criticize or comment on the Works.[12]

[Simmons.Decl.Exs.70 (RFAs 75, 77), 65 (72:4-9); Dkt.54("Seltzer.Decl.")

¶¶2, 40, Ex.G; Simmons.2d.Decl.Exs.125 (238:9-11, 255:5-18), 126

(319:12-15)]; *see Meltwater*, 931 F. Supp. 2d at 552-54 (clipping service

did not perform news reporting or research by re-disseminating the

AP's news reports).

    **Second**, even if TVEyes could rely on its subscribers' use, TVEyes

mischaracterizes its own evidence about its subscribers and their use of

the Content-Delivery Features.  As Dr. Knobel discovered, TVEyes

emphasizes organizations that make up a ███ proportion of its

subscribers.  [Knobel.2d.Decl. ¶29-30]; *supra* 29.  For example, while

TVEyes claims that law enforcement uses TVEyes to "track … public

service announcements," TB 28, in actuality, it is the Public

---

[12] As TVEyes is not engaged in reporting, its reliance on *Swatch Group Management Services Ltd. v. Bloomberg* is misplaced.  756 F.3d 73, 82 (2d Cir. 2014) (news reporting purpose supported fair use).

Information Officer (*i.e.*, a PR professional) at the Bellevue Police that uses TVEyes' service.[13]  [Knobel.2d.Decl. ¶31, Ex.162.at.4.]

Similarly, when listing the ways that TVEyes' subscribers use its service, TVEyes fails to distinguish between the Content-Delivery Features and the Index.  For example, while TVEyes repetitively cites the portion of the district court's 2014 opinion that recites TVEyes' characterization of how its subscribers use its service, TB 28, TVEyes fails to cite ***any*** findings that the Content-Delivery Features themselves—as opposed to the Index—were used for any of the alleged purposes TVEyes ascribes to its users.  [Sept.2014.Op.2-3, 25-26.] Similarly, the self-serving declaration of TVEyes' CEO generally conflates use of the Index with use of the Content-Delivery Features, and to the extent it makes the differences clear, it emphasizes use of the Index.  [Ives.Decl. ¶10.]  For example, it claims that "journalists use TVEyes to research the frequency of mentions of certain words across stations," for which video clips are unnecessary.  *Id.*  TVEyes' evidence

---

[13] This explains why TVEyes' watch terms emphasize information about the police.  TB 28 n.7 (citing [Seltzer.Decl.Ex.J.]).  If TVEyes really were used as TVEyes claims, watch terms for crimes or emergencies would be prominent, which they are not.

of use by journalism organizations and other entities likewise focuses on the Index (not the Content-Delivery Features). *See, e.g.,* [Rose.Decl.Exs.KK.at.24 ("*Media Matters* searched mentions of 'Christie' …."), WW.at.67 ("[T]he words 'drone' and 'drones' were used hundreds of times …."); Dkt.68("Anten.Decl.")Ex.DDD.][14]  As does the use in TVEyes' other cited evidence. *See* TB 30.

TVEyes' misdescription of its subscribers' use of the Content-Delivery Features is particularly egregious with regard to the Date/Time-Viewing feature.  TB 34.  TVEyes claims the feature is necessary to "[l]earn the market viewership or publicity values associated with a particular broadcast," *id.*, but those values come from third-party companies SQAD and Nielson, [Seltzer.Decl. ¶19], and could be provided without also distributing video clips.  TVEyes also claims the feature is needed to determine "which news outlet 'broke' a story first," TB 34, but clips are unnecessary for that purpose as shown by the examples on which TVEyes relies, none of which mention using the

---

[14]  [Ives.4th.Decl.Ex.ZZZZ.] is a self-serving screenshot of TVEyes' website from an unknown date and time.  It is not evidence of TVEyes' subscribers' actions.

Date/Time-Viewing feature, much less watching clips. [Karle.Decl.Ex.5; Dkt.73("Anten.2d.Decl.")Ex.WWW.]

Moreover, TVEyes' assertion that its subscribers only use the Content-Delivery Features for "internal research and analysis" makes a mockery of the fact that TVEyes designed, marketed, and encouraged use of its system to publicly distribute clips. *Supra* 14, 17. TVEyes cites to a contractual restriction in its License Agreement, TB 30, but there is no evidence that this agreement related to television content or was read by TVEyes' users. *Supra* 31. Indeed, contrary to TVEyes' assertion that "there is no evidence that any Fox clips … were e-mailed … in a manner inconsistent with this contractual restriction,"[15] TB 31, Dr. Knobel identified numerous instances where TVEyes-created video

---

[15] Without support, TVEyes asserts that its emailing feature "cannot constitute infringement because it merely enables the sharing of a *link* to a clip via e-mail and therefore does not implicate any of Fox's exclusive rights." TB 29. This is a *non-sequitur* because what is actionable is TVEyes' own copying and providing links to clips that resolve back to TVEyes' platform and not to the copyright holder. *Infra* 117. The emailing feature is relevant because it shows TVEyes' purpose is distribution of the content copied, which is not transformative.

clips were emailed by PR representatives promoting their clients. [Knobel.Decl. ¶81, Exs.23-25.][16]

***Third***, even if TVEyes correctly described its subscribers' use, its argument that its subscribers "fulfill purposes that differ from the original … purposes of the broadcasts," TB 28, is immaterial. The undiluted distribution of content could be used for all manner of purposes, but that does not make such distribution transformative. Indeed, the defendant in *Infinity* made the argument TVEyes asserts, and this Court responded that the defendant's subscribers can "monitor [the plaintiff's broadcasts] merely by turning on a radio." 150 F.3d at 108.

Similarly, here, there is no reason to believe that Fox's offerings could not serve such purposes (whatever they may be). Indeed, TVEyes' CTO admitted that subscribers can "monitor the media [by] watching television," [Simmons.2d.Decl.Ex.125 (53:4-12)], and each of the uses of the Date/Time-Viewing feature that TVEyes claims its users make, TB

---

[16] Even if TVEyes' subscribers only used the Content-Delivery Features for "internal" purposes, "internal use" does not equate to "fair use." *Texaco*, 60 F.3d at 923-25 (use within company not fair use); *Tullo*, 973 F.2d at 797 (clipping service that claimed it was used for "private study" not fair use).

34-35, also can be made using Fox's offerings.  Notably, TVEyes cited an email from Judicial Watch, in which one employee says that Fox's "discussion on Greta's show last night" included a graphic that was "credited to us."  TB 34 (citing [Ives.4th.Decl.Ex.BBBBB]).  The other employee forwards the email to TVEyes asking, "Please see if you can find this," and TVEyes provides the clip.  *Id.*  The same clip was and continues to be available on Fox's website, including the graphic:[17]



***Finally***, to the extent that TVEyes argues that the Content-Delivery Features are transformative because they are convenient, TB 33, this Court has rejected that argument.  *Texaco*, 60 F.3d at 919, 923 (not fair use to reproduce articles that were more "convenient" and

---

[17] *Supreme Conflict in 'Obamacare' Fight*, Fox News.com, at 3:04, http://video.foxnews.com/v/1279947309001/supreme-conflict-in-obamacare-fight/.

"useful" than purchasing authorized copies); *Infinity*, 150 F.3d at 108 n.2 (not transformative to make broadcasts "available by telephone rather than radio" even if "useful"). Moreover, the district court found TVEyes' factual arguments unconvincing. [Aug.2015.Op.4 (downloading "may be an attractive feature but it is not essential").] And, contrary to TVEyes' argument that providing offline downloads somehow satisfies an unfulfilled need of its subscribers, TB 33, the Works already are available offline. *Supra* 13.

***

TVEyes must prove that its use is transformative, and it has failed to do so. Thus, its commercial, bad faith exploitation of Fox's content "takes on a heightened importance," and the first factor heavily weighs against fair use. *United States v. ASCAP*, 599 F. Supp. 2d 415, 428 (S.D.N.Y. 2009) (citing *Davis v. Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001)).

### B.   Factor Two: The Works are Creative

As to the second fair use factor—the "nature of the copyrighted work," 17 U.S.C. §107(2)—TVEyes advocates a rule that telecasts on news channels (like the Works) cannot be creative or possibly even

copyrightable. TB 37-39. That argument is divorced from reality as factual works can be creative, making fair use unlikely. Television newscasting—like the entertainment programming that TVEyes also copies—is far more than a collection of isolated facts. Here, the Works "reflect creative endeavors," including the selection, arrangement, and compilation of numerous expressive elements—such as the commentary and analysis of Fox's professional staff, decisions about what to cover, and how to present it—to create a final product. [Sept.2014.Op.7; Wallace.Decl. ¶¶13-38; TVEyes.Resp.SUF ¶¶140, 142.] They are "unique and creative" compilations. *See Infinity*, 150 F.3d at 109.

While TVEyes selectively quotes from *Google* to support its position, TB 38, it ignores this Court's admonition that, while news reports are factual, "[i]t cannot seriously be argued that, for that reason, others may freely copy and re-disseminate news reports." 804 F.3d at 220; *see Harper*, 471 U.S. at 556-57 (copyright protects "factual narratives"); *Weissmann*, 868 F.2d at 1325 (scientific nature of work did not support fair use). Moreover, it is well-settled that compilations of facts and how they are expressed are protectable and can be creative. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 348-49 (1991).

TVEyes also asserts that this factor supports fair use because its subscribers access unprotected aspects of telecasts. TB 39. TVEyes is wrong. Legally, this factor considers the nature of the Works, not TVEyes' use. *Compare* 17 U.S.C. §107(2) *with id.* §107(1). TVEyes cites *Google* to support its argument, TB 40, but the portion of the opinion on which TVEyes relies relates to factor four, not factor two. 804 F.3d at 224. Factually, TVEyes' subscribers do not only retrieve unprotectable elements as they use TVEyes-created clips for their protected expression, as shown by their marketing and promotional use. *Supra* 24. Further, TVEyes only cites general statements based on conjecture as to how the TVEyes' system ***might*** be used.

## C. <u>Factor Three: TVEyes Made the Works Available in Their Entirety</u>

The third fair use factor—the "amount and substantiality of the portion used," 17 U.S.C. §107(3)—considers the portion taken in relation to the whole copyrighted work, *Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.*, 621 F.2d 57, 61-62 (2d Cir. 1980), and the importance of the portion copied. *Harper*, 471 U.S. at 564-65. When copying is "wholesale," a defendant "cannot benefit from the third factor." *Davis*, 246 F.3d at 175. As TVEyes recorded verbatim the

entirety of the Works (including their "heart"), [Aug.2015.Op.1; Answ. ¶¶1, 30, 31, 37; Simmons.Decl.Ex.69 (RFAs 20-38)], this factor favors Fox. *See Harper*, 471 U.S. at 565 (verbatim copying evidences qualitative value of copied material); *Infinity*, 150 F.3d at 110 (providing subscribers 24/7 access to broadcasts weighs against fair use).

TVEyes tries to evade this finding by arguing that the amount of content "accessed by users … was not excessive," citing *Google*. TB 41. *Google*, however, considered how much content the Google Books service "***made accessible***," not what was actually ***accessed***. 804 F.3d at 222 (substantiality increases based on "quantity" of material made available and "control the searcher can exercise" over it).

Indeed, Google's offering was limited. It showed only "enough context surrounding the searched term to help" evaluate whether the book was responsive to a search. *Id.* at 218. It provided three "snippets" of books in response to all similar queries (*i.e.*, additional snippets were not revealed through repeated searches or using different computers). *Id.* at 209-10, 218, 222, 230. The word "snippet" was not a

mere incantation, it specifically meant a small amount of text that was

no more than one-eighth of a page:



*Id.* Google Books also "blacklist[ed]" (*i.e.*, made permanently

unavailable) (a) 10% of each book, (b) "one snippet on each page," and

(c) any "books, such as dictionaries and cookbooks, for which viewing a

small segment is likely to satisfy the searcher's need." *Id.* And Google

completely excluded books from snippet view at rights holders' request.

*Id.*

TVEyes' Content-Delivery Features are not like Google Books.

TVEyes copies and distributes ***all*** of Fox's content 24/7 without

blacklisting and provides all of it to TVEyes' users as unlimited,

lengthy, high-definition clips. [Simmons.Decl.Exs.64 (319:9-18), 66

(52:22-7) ("Q:It doesn't blacklist any material?  A.  Not that I know.")];
*supra* 14, 62.  Furthermore, TVEyes does not exclude content at the
request of the copyright holder as Google Books did.  *Supra* 40.

Moreover, even if the length of the clips accessed by TVEyes' users
were relevant, TVEyes' claimed durations of those clips are unreliable
as TVEyes calculated them by subtracting the time a user started
watching a clip from the time of the user's "next use of TVEyes' system."
[Simmons.3d.Decl.Ex.185 (366:23-373:8).]  If, however, a user were
watching a clip while simultaneously performing other functions—such
as searching for her next video clip or comparing two videos side-by-
side—TVEyes' calculations would not reflect it.  *Id.*

Should this Court rely on TVEyes' claimed durations, TVEyes still
would not meet its burden under this factor as TVEyes' CEO conceded
that users can "download an entire news story."  [Simmons.Decl.Ex.66
(54:17-20).]  Indeed, TVEyes' Systems Architect admitted that the
"average length of the clips played by TVEyes users that sourced from
the Works" was approximately one minute, with some clips over six
minutes.  [Seltzer.Decl. ¶44.]  As the average news segment is similarly
short, [Wallace.Decl. ¶30], TVEyes' claimed clip length still damns its

case as it copies the "heart of the work." *Harper*, 471 U.S. at 565

(copying 300 words from 200,000 word manuscript not fair use).

Moreover, TVEyes' Architect acknowledged that, even while using a

flawed methodology that ignores users that watch programs without

commercials, [Knobel.Decl. ¶10], there are multiple instances in which

TVEyes users accessed two or more consecutive 10-minute clips of FNC

content.  [Seltzer.Decl. ¶5.]

### D.  Factor Four: The Content-Delivery Features Affect the Market for and Value of the Works

The fourth fair use factor is "the effect of the use upon the

potential market for or value of the copyrighted work."  17 U.S.C.

§107(4).  Where a defendant "replaces [the copyright holder] as the

supplier of [its own content]," this factor weighs against fair use.  *See*

*Infinity*, 150 F.3d at 111.  It also weighs against fair use where a

defendant "avoid[s] paying 'the customary price'" for the work because it

diminishes the opportunity to "license to others who might regard [the

work] as preempted by the [defendant's use]."  *Davis*, 246 F.3d at 176.

In other words, when one entity uses a work without a license, it

"cheapens the value of [the] work by competing with companies that *do*

pay a licensing fee."  *Meltwater*, 931 F. Supp. 2d at 561.

While Fox provides a fulsome explanation below of TVEyes' effect on both the value of and market for Fox's content, it should not be overlooked that TVEyes' brief makes three critical omissions and misstatements. ***First***, TVEyes fails to mention that this analysis is not limited to TVEyes' use of the particular Works at issue, but rather asks "whether unrestricted and widespread conduct of the sort engaged in by [TVEyes]," *Campbell*, 510 U.S. at 590, would affect the actual or potential value of, or markets for, the type of works at issue. *Harper*, 571 U.S. at 568–69 (applying a "broader perspective"); *Texaco*, 60 F.3d at 941 n.12 (considering "category of a defendant's conduct, not merely the specific instances of copying"). In other words, this Court need consider only whether TVEyes' use will affect any of Fox's "traditional, reasonable, or likely to be developed" markets, *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997), because "when multiplied many times," such use becomes "in the aggregate a major inroad on copyright that must be prevented." *Harper*, 471 U.S. at 569.

***Second***, TVEyes ignores the particularly high burden it has with regard to this factor. In all fair use cases, the defendant "bears the burden of showing an absence of 'usurpation' harm." *Infinity*, 150 F.3d

at 111. With "verbatim copying of the original in its entirety for commercial purposes" (as is the case here), however, courts "presume that a likelihood of future harm … exists." *Campbell*, 510 U.S. at 591.

**Third**, TVEyes asserts that the harm caused by TVEyes is not sufficiently significant to weigh against fair use. TB 42. As discussed below, TVEyes' assertion is contrary to the facts as Fox has introduced evidence of the substantial harm that would be caused if TVEyes' use were to become widespread. *Infra* 69.

Even if that were not the case, contrary to TVEyes' legal argument, TB 48-50, Fox is not required to show lost sales or concrete damages. This factor considers **potential** value and markets, such that a copyright holder need not prove that it occupies or even intends to enter a market, much less show lost revenue. *Ringgold*, 126 F.3d at 81 (reversing district court that confused "lack of … damages with lack of adverse impact on a potential market" and holding that a plaintiff is not required to show "a decline in the number of licensing requests"); *Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 136, 145-46 (2d Cir. 1998) (factor favored copyright holder even though there was "no evidence that [the defendant's use] diminished [the plaintiff's work's]

profitability" and plaintiff "evidenced little if any interest in exploiting this market"); *see also Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000) (effect on potential market despite plaintiff stopping publication of work and lack of "actual … monetary loss").[18]

### 1. The Negative Effect of TVEyes' Content-Delivery Features on the Value of and Market for Fox's Content

The Content-Delivery Features' negative effect on the value of and market for Fox's content is clear. TVEyes illicitly acquires Fox's content by falsely claiming to be an individual customer and violating its subscription agreements. *Supra* 16. TVEyes then copies Fox's content and distributes it to paying subscribers, not one of which is required to pay for an MVPD subscription of its own. *Supra* 17. In doing so, TVEyes markets the Content-Delivery Features as a replacement for watching live TV, using a DVR, and paying for video clips from a

---

[18] TVEyes circularly argues that transformative uses do not cause market harm because they do not substitute for the work. TB 41. Even if this Court found that the "purpose of [TVEyes'] copying is" transformative (it should not, *supra* 60), "such copying might nonetheless harm the value of the copyrighted original if done in a manner that results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute." *Google*, 804 F.3d at 223.

licensed "traditional clipping service."  *Supra* 14; *Wainwright Sec. Inc.*
*v. Wall Street Transcript Corp.*, 558 F.2d 91, 96 (2d Cir. 1977) (no fair
use where use was "with the obvious intent, if not the effect, of fulfilling
the demand for the original work").  Indeed, TVEyes' CEO admitted



[Simmons.Decl.Ex.66 (83:17-22).]  By 2013, the Content-Delivery
Features had played ▮▮▮▮▮▮ video clips, [Simmons.Decl.Ex.90], and
downloaded ▮▮▮▮▮ clips.  [Simmons.Decl.Ex.91.]  No doubt those
numbers are exponentially higher today, even without considering
widespread use.

It is TVEyes' burden to show that it does not offer "a substitute"
that causes harm to Fox's "interests" or "a market that properly belongs
to" Fox.  *See Infinity*, 150 F.3d at 110-11.  The facts of this case make
doing so impossible.

Digital and Online Distribution.  The Content-Delivery Features
harm Fox's online and digital markets.  ***First***, although not addressed
in TVEyes' brief, TVEyes affects the value of Fox's clips.  Unlicensed

use of video clips is "likely to erode the market value for those clips." *Video-Cinema Films, Inc. v. Lloyd E. Rigler-Lawrence E. Deutsch Found.*, No. 04-CV-5332, 2005 WL 2875327, at *8 (S.D.N.Y. Nov. 2, 2005). As described by Elizabeth Ashton—Executive Interviews' Global Head of Sales and Marketing—that is what happened here. By offering Fox's content for a flat fee through its Content-Delivery Features, TVEyes lowered the licensing rates at which clients will pay for that content. [Ashton.Decl. ¶20; Ashton.2d.Decl. ¶15]; *see also* [Knobel.Decl. ¶¶84-94.] Similarly, Mr. Misenti observed that TVEyes' "all-you-can-eat" service makes people feel they do not need a license to Fox's content so "they can freely pirate the content and put it where they see fit." [Simmons.3d.Decl.Ex.186 (29:3-21).]

***Second***, as Dr. Knobel concluded, the Content-Delivery Features directly compete with Fox's "legitimate clippings." [Simmons.3d.Decl.Ex.187 (21:6-8); Knobel.Decl. ¶¶89-92.] ITN Source and Executive Interviews sell and license video clips of Fox's content to the same kinds of organizations that subscribe to TVEyes. *Compare* [Misenti.Decl. ¶21-23; Williams.Decl. ¶¶7-12, 21-27, Ex.25; Ashton.Decl. ¶¶3, 8-9, 20.] *with* [Sept.2014.Op.5.] Without paying to

license content, and by offering content on an all-you-can-eat basis,

TVEyes is able to undersell Fox's partners and market its features as

"far less expensive, than using old-fashioned press clipping services"

that charge per-clip.  [Simmons.Decl.Ex.111.at.TVEYES-008271.]  By

2013, TVEyes had created over ███ clips of Fox's content without any

license fees paid, [Simmons.Decl.Ex.91.], which equates to █████

███████████ in lost revenue.  [Ashton.Decl. ¶17.]

Executive Interviews' lost sales from TVEyes' practices were

detailed by Ms. Ashton.  [Ashton.Decl. ¶¶24-34; Ashton.2d.Decl. ¶¶13-

17.]  For instance:



The Content-Delivery Features have cannibalized the market for Fox's clips, and will do the same to the clips of other television networks. *Supra* 13. If others are able to make the same indiscriminate use, the effect on this growing and essential market will be substantial. [Ashton.Decl. ¶¶24-33; Williams.Decl. ¶32.]

**Third**, TVEyes' video clips substitute for the clips Fox makes available on its website, depriving Fox of pre-roll and banner advertising revenue (a very important market for Fox). *Supra* 10; [Simmons.3d.Decl.Exs.186 (27:8-10), 187 (54:25-55:6); Knobel.Decl. ¶98; Misenti.3d.Decl. ¶¶12, 19-24; Misenti.Decl. ¶26.]

This problem is compounded when online clips are disseminated to others. When people distribute Fox's authorized video clips through its website, the clips link back to Fox's website and increase the audience for its advertising. *Supra* 10. The Content-Delivery Features distribute clips linking to TVEyes, not Fox. *Supra* 24. The absence of such linkage back to Fox's website also impairs Fox's ability to use its websites to promote its other programming. [Knobel.Decl. ¶103; Misenti.3d.Decl. ¶14]; *see Video Pipeline*, 342 F.3d at 202 (effect on market where defendant's substitutive website deprived plaintiff of the

ability to "advertise, cross-market and cross-sell other products").  Were such use to become widespread, it would devastate Fox's growing online distribution market.  [Misenti.Decl. ¶19.]

*Fourth*, TVEyes competes with Fox's syndication partners for the same reasons it substitutes for clips on Fox's websites.  [Misenti.Decl. ¶20; Simmons.Decl.Ex.66 (115:15-18).]  Moreover, the Content-Delivery Features harm Fox's "negotiating position with its [syndication] partners and the revenues it receives from them."  [Knobel.Decl. ¶102.] As explained by Fox's Chief Digital Officer, Jeff Misenti, these partners "view [Fox's] content as premium," but TVEyes' "unfettered" distribution makes that content no longer exclusive, which means it "has been devalued."  [Knobel.Decl.Ex.13 (56:12-19).]

*Fifth*, by offering streaming television, [Seltzer.Decl. ¶6, Ex.G.at.7-10]—which TVEyes markets as a replacement to "watch live TV" online, [Sept.2014.Op.6]—TVEyes' Content-Delivery Features divert viewers from Fox's TVEverywhere service, making MVPD subscriptions unnecessary.  [Misenti.Decl. ¶9; Knobel.Decl. ¶¶105-09; Misenti.3d.Decl. ¶28; Cronin.Decl. ¶7.]  Indeed, the district court found that TVEyes' Date/Time-Viewing feature "duplicates Fox's existing

functionality." [Aug.2015.Op.18.] Therefore, the features "usurp[]" the existing authenticated viewing market and "obviate the need for such services," destroying the incentive to invest in digital properties. [Misenti.3d.Decl. ¶28.]

**Sixth**, TVEyes occupies the potential market for Fox's licensing to media monitoring and clipping services. As explained above, the standard practice of TVEyes and similar services is to license the content they record. *Supra* 14. The Content-Delivery Features—particularly TVEyes' distribution to its Sales Partners, *supra* 29—occupy this potential market for Fox's content. *Supra* 68.

<u>Traditional Television</u>. The Content-Delivery Features also harm Fox's traditional television distribution in three ways. **First**, the Content-Delivery Features diminish the value of Fox's programming. MVPDs—which pay television networks to carry their programming—will seek to pay lower carriage fees because those fees are determined, in part, by ratings, [Carry.Decl. ¶18], and TVEyes' users are not included in those ratings and are not required to have MVPD subscriptions. [Misenti.Decl. ¶¶12, 16, 19; Simmons.Decl.Ex.66 (97:16-94:4).] Thus, as recognized by this Court, such use will "devalue the

- 75 -

programming" and "undermin[e] existing and prospective retransmission fees, negotiations, and agreements." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012); [Carry.Decl. ¶18]. If TVEyes' practices become widespread, the problem will escalate for all MVPDs and the channels that provide them content. [Knobel.3d.Decl. ¶11; Carry.Decl. ¶¶19, 21.]

**Second**, TVEyes harms the value of Fox's content to advertisers. Advertising fees are "determined by the number of viewers and their demographic profiles," *WPIX*, 691 F.3d at 285, but TVEyes' users are not counted in Fox's ratings. [Misenti.Decl. ¶¶12, 16, 19; Carry.Decl. ¶18; Villar.Decl. ¶8.] Thus, such use will fragment and divert Fox's viewership, "weaken[ing Fox's] negotiating position with advertisers and reduc[ing] the value of its … advertisements." *WPIX*, 691 F.3d at 286.

**Third**, the Content-Delivery Features replace the market for Fox's telecasts by supplying high-quality video clips of those telecasts in real-time to its subscribers. *Supra* 18. TVEyes' marketing materials and its own users explain that anyone can "watch live TV, 24/7, on any station [TVEyes is] recording." [Simmons.Decl.Exs.88, 64 (303:11-19);

Cronin.Decl. ¶7.]  This Court has held that "streaming copyrighted works without permission" would "drastically change the industry." *WPIX*, 691 F.3d at 286.  Indeed, the traditional television market attempts to strike a balance between digital and traditional distribution, [Misenti.4th.Decl. ¶5; Carry.Decl. ¶10.], but by offering all of Fox's content online, TVEyes destroys that balance and threatens Fox's business model.  [Misenti.4th.Decl. ¶6.]  As this model is standard across the television industry, TVEyes and companies that may adopt its business model pose a serious danger.  *Id.*

***

Any one of the foregoing effects to the value of and market for Fox's content would be sufficient to weigh this factor against a finding of fair use.  *See Nihon*, 166 F.3d at 73 (market effect where defendant's business "compete[d] with and supersede[d]" plaintiff's).

## 2. TVEyes Incorrectly Inverts the Factor Four Analysis

TVEyes asks this Court to invert the traditional factor four analysis by arguing that its subscribers "are unlikely to use Fox's website as an alternative" for the Content-Delivery Features because Fox does not make its content available in the same format or under the

same conditions as TVEyes.  TB 46.  **TVEyes' argument turns the factor four analysis on its head.**  The question is whether TVEyes provides a service that occupies a "market that properly belongs to" Fox.  *Infinity*, 150 F.3d at 110.  A copyright holder is not required to provide any services in a market, much less provide the same service provided by the defendant.  *Supra 66.*

TVEyes essentially asserts that, to safeguard her work, a copyright holder must make all possible uses of it.  The courts of appeals have uniformly rejected that approach.  In *Infinity*, this Court held that the defendant's occupation of the copyright holder's market even "in [a] different form" from the copyright holder, "weighs in [the copyright holder's] favor." 150 F.3d at 111.  In *Tullo*, the Ninth Circuit found that, even though the plaintiff marketed raw footage and the defendant marketed edited news clips, there was "an overlap between the [defendant's] market and the *potential* [plaintiff's] market."  973 F.2d at 798-99.  In *Duncan*, the Eleventh Circuit held that where the defendant sold copies of the plaintiff's news telecasts that it "could itself sell if it so desired" but did not, the defendant "competes with [the plaintiff] in a potential market and thereby injures the television

station."  744 F.2d at 1496-97, 1499 (finding effect on market despite only $35 of actual damages).  And in *Video Pipeline*, the Third Circuit held that video clips distributed for a fee as part of an Internet-based, searchable database substituted for the authorized (but different) clips of the same content provided by the plaintiffs and affected their market.  342 F.3d at 195-96, 202-03.

In addition to incorrectly stating the legal standard, TVEyes' factual assertions are wrong.  As to the market for clip licensing:

- TVEyes asserts that Fox's licensing partners market to different customers than TVEyes, TB 43, but ***they actually sell to the same types of organizations***.  *Supra* 13.

- TVEyes claims that Fox's partners issue only "public performance licenses" and TVEyes "prohibits such uses."  TB 43, 49.  TVEyes errs.  ***First***, Fox licenses for internal use.  [Misenti.3d.Decl. ¶¶33-44; Knobel.2d.Decl. ¶¶4, 11-16; Ashton.Decl. ¶13; Ashton.2d.Decl. ¶¶3, 9, 11, Exs.182-84.]  ***Second***, as shown by its marketing materials and its users' actual behavior, TVEyes does not limit its users in this way.  *Supra* 24, 31.

- TVEyes asserts that Fox's partners have not issued a license for the Works, TB 43-44, but ignores that Fox itself licensed the Works to its partners.  *Supra* 12, 13.  TVEyes also ignores the potential licensing market that the Content-Delivery Features inhibit.  *Supra* 68.

- TVEyes makes much of ITN Source's license agreement for Fox's content, TB 44-45, 50-51, but provides no evidence that those provisions were ever enforced or a license denied on

- 79 -

that basis. [Misenti.4th.Decl. ¶7; Ashton.3d.Decl. ¶5.]
Indeed, contrary to TVEyes' suggestion that ███████████
███████████████████████████████████ TB 44,
Executive Interviews routinely licenses clips that ██████
████████████████████. [Ashton.3d.Decl. ¶3.] Moreover,
authorized Fox clips have been used to criticize and
comment on Fox and its coverage. [Misenti.4th.Decl. ¶9,
Ex.206.]

As to the market for clips on Fox's website:

- TVEyes claims that only "16% of Fox's broadcasts are ever available for viewing on its website" or "*anywhere* on the Internet." TB 46, n.11. The 16% number, however, was calculated based on the length of video clips that Fox makes available on its public-facing website. When authenticated and advertising-supported content is considered, Fox makes **all** of its content available on its website. *Supra* 9, 10. Even focusing solely on Fox's publicly-available clips, the 16% number does not take into account commercial breaks or re-runs. When properly calculated, 50% of Fox's telecasts are available for free with the only requirement that users view pre-roll and/or banner advertising.[19] [Misenti.Decl. ¶13; Misenti.3d.Decl. ¶7.]

- TVEyes asserts that Fox "prohibits visitors from using content on the site for business purposes," TB 46, but Fox's website is intended only to prohibit users from reproducing and selling Fox's content, as TVEyes does. The authorized clips themselves can be used freely. [Misenti.Decl. ¶16.]

- TVEyes claims that Fox's clips are "edited," "hand-selected," and "lack basic information." TB 47. Clips, however, are altered only in the rare instance that an error is discovered after the segment aired, [Simmons.4th.Decl.Ex.220 (113:8-

---

[19] To do otherwise would undermine the balance between traditional and digital distribution of Fox's content. *Supra* 14 n.3.

114:21)], as all news organizations should be incentivized to do. The other alteration cited by TVEyes—removing the ticker from the bottom of clips—is made because the video may be accessed years later when the information (such as stock prices or emergencies) no longer reflects current events and could be misleading. [Misenti.2d.Decl. ¶5.] Further, putting the most newsworthy and interesting clips on Fox's website makes it likely that the same clips sought by TVEyes' users also are on Fox's website. [Rose.3d.Decl.Ex.MMMMM (121:5-7).] Finally, TVEyes is wrong that Fox's clips do not provide "the time that the footage was originally broadcast." *Compare* TB 47 *with* [Misenti.Decl. ¶14.]

- While TVEyes is correct that Fox's clips cannot be "saved, edited or downloaded," TB 47, 49, as doing so would harm Fox's markets, Fox's clips can be embedded and otherwise used for the same purposes as TVEyes-created clips. *Supra* 10. Moreover, downloadable clips are available from Fox's licensing partners. *Supra* 13.

- TVEyes asserts that Fox's clips always start at the beginning as opposed to 15 seconds before a searched for keyword. TB 47. This is incorrect as visitors to the Fox website can "deep link into the content, so if a piece of content starts at one and runs through ten and the user wants to start at point three, [Fox does] allow that functionality." [Rose.4th.Decl.Ex.KKKKK (94:18-22).][20]

---

[20] TVEyes' reliance on the TV News Archive, TB 48, is misplaced. The Archive, *supra* 20, also has a negative effect as its clips do not link back to Fox's websites, devalue Fox's content, and divert viewers from Fox's businesses.

### E.    Considerations of the Public Interest Favor Fox News

In addition to the four factors, courts consider the interests of the public in deciding fair use cases. They, however, do not blindly consider the benefit provided by the defendant's use, but study the implications on the copyright holder. *Weissmann*, 868 F.2d at 1325-26 (disincentive to copyright holder harms the public). Indeed, the Supreme Court has admonished courts that "gave insufficient deference to the scheme established by the Copyright Act for fostering the original works" *Harper*, 471 U.S. at 545-46, 560, as the Framers intended copyright to promote "free expression" by "establishing a marketable right." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). Thus, courts are not empowered "to ignore a copyright whenever it determines the underlying work contains material of possible public importance." *Iowa*, 621 F.2d at 61. Rather, where "there is a fully functioning market that encourages the creation and dissemination" of a work, "permitting 'fair use' to displace normal copyright channels disrupts the copyright market without a commensurate public benefit." *Harper*, 471 U.S. at 566 n.9.

### 1.    Public Benefits of the News Industry

Here, the "public has a compelling interest" to induce the creation of "television programming." *WPIX*, 691 F.3d at 287. In particular,

news organizations perform the "essential function of democracy" of "[i]nvestigating and writing about newsworthy events," which is "an expensive undertaking." *Meltwater*, 931 F. Supp. 2d at 553.

Fox and other news organizations produce journalism. [Knobel.Decl. ¶6.] They spend hundreds-of-millions of dollars a year gathering news. [Knobel.Decl. ¶182; Simmons.3d.Decl.Ex.188 (73:22-74:16, 178:24-179:23).] They train journalists. [Berg.Decl. ¶6.] They hire reporters and producers, who put their lives at risk to deliver news. [Knobel.Decl. ¶179.] They ferret out government corruption. [Knobel.Decl. ¶¶6, 179.] They critique and comment on one another. [Knobel.3d.Decl. ¶¶20-21.] Even TVEyes' expert agrees that they play "a critical role in our society." [Karle.Decl. ¶192.] Protecting the ability of these organizations to survive is the true public interest.

Yet, this is a time of stress and transition for television news. Viewers are moving away from traditional television towards online and digital distribution of short news clips, making new monetization models "essential." *Supra* 5.

News organizations, including Fox, are developing robust digital and online presences to meet this growing demand. *Supra* 9-14. The

Content-Delivery Features halt that evolution by diverting the viewers that the television news industry needs to convert to users of its new digital platforms. *Supra* 69. If this Court allows TVEyes to continue unabated, it will "prevent news companies and other creative companies [from] generating revenue from … copyrighted material," harming "the whole ecosystem." [Simmons.Decl.Ex.66 (213:6-16).] Even the district court found that TVEyes' downloading function does not "make TVEyes valuable to the public, and poses undue danger to content-owners' copyrights." [Aug.2015.Op.16.] Thus, any benefit from TVEyes does not "outweigh the strong public interest in the enforcement of the copyright laws or justify allowing [it] to free ride on the costly news gathering and coverage work performed by other organizations." *Meltwater*, 931 F. Supp. 2d at 553.

## 2. TVEyes' Public Benefit Argument Fails

TVEyes repetitively asserts that the Content-Delivery Features benefit the public in two ways. TB 36-37, 51. ***First***, it claims that the features enhance the public's ability to comment on news disseminated by Fox. *Id.* at 51. That is untrue as TVEyes' service is not available to the general public. *Id.* at 7. Moreover, this argument is inconsistent

with TVEyes' assertion that the Content-Delivery Features are not used externally. TB 8, 30, 43. It also is contradicted by TVEyes' marketing materials, which make clear that the service's primary purposes are business-related activities like "Exit Packages for Clients." *Supra* 29. Tellingly, these materials do not mention commentary or criticism. *Id.*

Even if TVEyes did provide those public benefits, they can "be accomplished by other methods" and, thus, cannot justify a finding of fair use. *Infinity*, 150 F.3d at 108-09. Indeed, where "the public will still be able to access [television] programs through means other than [such] Internet service[s], including cable television," there is no reason to distort traditional copyright principles. *WPIX*, 691 F.3d at 288.

TVEyes has not met its burden to prove that the Content-Delivery Features alone are able to provide the benefits TVEyes claims. Fox makes its telecasts available to the public in numerous ways. *Supra* 5-14. Moreover, there are additional ways to access Fox's content, including using recording tools and news archives. *Supra* 37. These archives are able to provide the same benefits TVEyes describes, including as noted by TVEyes' own *amici* for use in studies of television news. *See* Internet Archive Br. 9-19. As there are non-infringing

alternatives to the Content-Delivery Features, there is no need to sanction TVEyes' for-profit service in contravention of three decades of settled law. *Supra* 48. Moreover, any benefit pales in comparison to the vital public service performed by television news organizations, which the Content-Delivery Features put at risk. *See Meltwater*, 931 F. Supp. 2d at 553 (plaintiff's news reporting outweighed any public interest in defendant's clipping of those reports).

**Second**, TVEyes claims the features facilitate "access to news *made* by Fox." TB 51. However, the fact that a work itself may be "'newsworthy' is not an independent justification for unauthorized copying of the author's expression." *Harper*, 471 U.S. at 557. Nor does mere interest in a televised program make it "a fact that could be reported and analyzed," justifying fair use. *Twin Peaks Prods. v. Publ'ns Int'l*, 996 F.2d 1366 (2d Cir. 1993); *Wainwright*, 558 F.2d at 96-97. Indeed, the Ninth Circuit in *Tullo* rejected the same argument TVEyes advances. 973 F.2d at 797 (service "no more a 'news reporter' than the [VCR] owner who tapes a publicly broadcast movie is a filmmaker").

Even if TVEyes could advance such an argument, the alternatives discussed above could fill that interest as there is no shortage of ways to criticize or comment on Fox's coverage. *Supra* 37; [Misenti.4th.Decl. ¶9-10, Exs.206-07.]

***

A holistic consideration of the public benefit favors Fox. The Content-Delivery Features are not fair use.

## II. THE DISTRICT COURT'S ADVISORY OPINION WAS ERROR

The district court held that TVEyes' emailing feature is not fair use, but if certain "protective measures" were developed and implemented, it could be. [Aug.2015.Op.18.] It then delineated those hypothetical features in an impermissible advisory opinion. [Dkt.184("Nov.2016.Op.")2-3.] This Court reviews the justiciability of such opinions *de novo*. *See Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977); *Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.*, 415 F. App'x 264, 266 (2d Cir. 2011).

Both as a matter of law and practice, courts lack the "power to render" fair use decisions on hypothetical facts. *See United States v. Broad. Music, Inc.*, 275 F.3d 168, 178-79 (2d Cir. 2001). As a matter of

law, while issuing such opinions may be "nice," it is well-settled that "advisory jurisdiction" is "inconsistent with Article III[]." *Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d 496, 498-99 (7th Cir. 2014). As a matter of practice, courts are to evaluate fair use on the actual facts before them. *See Google*, 804 F.3d at 225 (considering system as "presently designed"); *Texaco*, 60 F.3d at 916 (fair use "depends on consideration of the precise facts at hand"). Doing so is necessary as there is no mechanism for discovery of, or testing conclusions based on, hypothetical facts.

While the district court's holding that the Content-Delivery Features' emailing and sharing feature was not fair use should be affirmed, the advisory opinion about hypothetical protective measures should be vacated and the feature enjoined in its entirety.

## III. TVEYES' OTHER GROUNDS FOR APPEAL ARE MERITLESS

### A. TVEyes Acted Volitionally and Directly Infringed Fox's Content

TVEyes appeals the district court's finding that TVEyes' "illegal use reflects 'volitional conduct.'" [Nov.2015.Op.2.] While there is debate after *American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014), as to whether this defense even exists, this Court need not reach

that question.  TVEyes' selection of what telecasts to include in its service, copying of those telecasts, and use of those telecasts as a master copy for distribution purposes, [Sept.2014.Op.11], is text-book volitional reproduction.  *See Aereo*, 134 S.Ct. at 2513 (Scalia, J., dissenting) (explaining that "selection and arrangement … constitutes a volitional act … and thus serves as a basis for direct liability").[21]

TVEyes' argument ignores its direct copying and reproduction, and instead focuses on the subsequent steps of allowing additional copies to be watched, downloaded, and redistributed.  TB 52.  Even if this Court considers such use, offering Fox's content to watch, *supra* 18, download, *supra* 21, and redistribute, *supra* 24, also constitutes volitional infringement.  *Aereo*, 134 S. Ct. at 2507 ("Aereo 'performs'" even though its "system remains inert until a subscriber indicates that she wants to watch a program"); *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 490-91, 506 (2001) (electronic service for viewing, printing, and downloading infringed); U.S. Copyright Office, *Report on the Making Available Right in the United States*, at 3, 36, 39, 42-47,

---

[21] TVEyes' *amici* embrace this opinion as "a thorough exposition of the volitional conduct requirement."  EFF Br. 11.

http://www.copyright.gov/docs/making_available/making-available-right.pdf ("public performance right encompasses offers to stream" and allowing the public to "access downloadable copies of a work on demand" constitutes distribution).

TVEyes asserts that the Content-Delivery Features are like the service in *Cartoon Network, LLLP v. CSC Holdings, Inc.* ("*Cablevision*"), 536 F.3d 121 (2d Cir. 2008). They are not. ***First***, the technologies are different. *Cablevision* involved a Remote Storage DVR that worked like a DVR but resided on the defendant's servers. *Id.* at 124-125. Unless a subscriber chose to record a program, it only was retained for 0.1 seconds, which would have constituted copyright infringement if this Court had not also found that 0.1 seconds was insufficiently fixed to constitute infringement. *Id.* at 127-30. By contrast, TVEyes, like a Video-On-Demand service, selects the telecasts to include, copies them, retains them for 32 days on its servers, and makes them available for viewing. [Sept.2014.Op.11.] This is longer than necessary to prove fixation, involves "control" by TVEyes, and constitutes volitional copying. *Cablevision*, 536 F.3d at 132.

**Second**, TVEyes attempts to shift this Court's focus from TVEyes' acts of copying, distribution, and performance to those of its subscribers. TB 55. The *Cablevision* defendant was licensed to transmit programs to its subscribers as a traditional cable system. 536 F.3d at 124. Its users then selected and saved their own copies of those programs. *Id.* at 124. Unlike the *Cablevision* defendant, TVEyes does not have a license to copy and distribute Fox's programs to its paying subscribers. TVEyes, however, tries to shoehorn the facts of this case into the *Cablevision* framework, by equating the *Cablevision* defendant's license to an alleged finding by the district court that it was fair use for TVEyes to "initially capture broadcast content" to create the Index. TB 55. The Index and the Content-Delivery Features, however, involve independent acts of copying by TVEyes. *Supra 17*. Thus, TVEyes' reproduction of Fox's audiovisual content to provide the Content-Delivery Features alone is sufficient to establish TVEyes' volitional conduct.

Moreover, TVEyes itself stores the copy that it distributes to its users to watch and download. *Supra* 17. Furthermore, there is a significant difference between a licensee going beyond its authorized

scope, as was the allegation in *Cablevision*, and TVEyes' claiming carte

blanche use of all of Fox's content based on fair use. *See Harper*, 471

U.S. at 558 ("The fair use doctrine is not a license for corporate theft

…").

**Finally**, *Cablevision* did not address the distribution or public

performance rights that TVEyes infringes. Under *Cablevision*, TVEyes

acts volitionally.

## B. The District Court Did Not Abuse Its Discretion by Enjoining TVEyes

TVEyes seeks to overturn the district court's injunction, TB 56,

but the district court did not abuse its discretion. **First**, TVEyes argues

that the district court failed to consider the *eBay* factors or make

sufficient factual findings. TB 56-57. The district court, however,

reached its conclusion after years of litigation, multiple fact and expert

discovery periods, numerous rounds of briefing, two summary judgment

decisions containing factual findings, [Sept.2014.Op.], [Aug.2015.Op.],

and the parties' briefing of the *eBay* factors.[22]

[Dkt.186("Joint.Submission.")14-17, 35-37.]

---

[22] By contrast, the out-of-Circuit decision, cited by TVEyes, denied the parties' motions "in summary form," "without explanation." *Ecolab,*

***Second***, TVEyes asserts that the factual record does not support entry of an injunction, but that is incorrect:

- Far from "speculative" as TVEyes asserts, TB 57, the district court found concrete harms to Fox from the Content-Delivery Features, including the "undue danger" that they "pose … to content-owners' copyrights" and "the substantial potential for abuse."[23] [Aug.2015.Op.14-16] Furthermore, there is ample evidence of such harm in the record, *supra* 69-77, and this Court has held that these types of harms are irreparable. *WPIX*, 691 F.3d at 285. TVEyes also asserts that Fox delayed in bringing suit, TB 58, but offers no evidence that it was harmed by such delay as required by the case it cites. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014).

- TVEyes claims without factual support that monetary remedies would adequately compensate Fox, TB 58, but where infringement "harms … the operation and stability of the entire industry, monetary damages could not adequately remedy plaintiff's injuries." *WPIX*, 691 F.3d at 286.

---

*Inc. v. FMC Corp.*, 569 F.3d 1335, 1341 (Fed. Cir. 2009), *rev'g*, Order (Dkt. 502), No. 05-CV-831 (merely stating motions were "denied").

[23] The cases on which TVEyes relies, TB 57-58, to demonstrate speculative harm are distinguishable. *See Kamerling v. Massanari*, 295 F.3d 206 (2d Cir. 2002) (affirming denial of injunction regarding disability benefits because harm alleged was economic and no likelihood of success on merits); *Herb Reed Enter., LLC v. Florida Enter. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (out-of-Circuit trademark decision holding that record, not just findings below, did not support likelihood of irreparable harm); *Caldwell Mfg. Co. N. Am., LLC v. Amesbury Grp., Inc.*, No. 11-CV-6183, 2011 WL 3555833, at *4 (W.D.N.Y. Aug. 11, 2011) (district court patent decision where only evidence submitted was short declaration from marketing executive).

- TVEyes argues (again without factual support) that the balance of the hardships favors it because its business model will be jeopardized, TB 58, but an infringer "cannot complain about the loss of ability to offer its infringing product." *WPIX*, 691 F.3d at 287. Indeed, it cannot be "harmed by the fact that it cannot continue streaming plaintiffs' programming, even if this ultimately puts [the infringer] out of business." *Id.* (internal quotation marks omitted); *My-T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir. 1934) ("[A]dvantages built upon a deliberately plagiarized make-up do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed."). Moreover, TVEyes may continue to provide the Index, upon which it heavily relied as the basis for fair use below.

- TVEyes reasserts its fair use public benefit arguments, TB 59, but each argument fails. *Supra* 82.

*Finally*, the district court enjoined TVEyes' use of "all Fox News content copied." [Nov.2016.Op.3.] TVEyes argues that it should have been limited to the nineteen Works. TB 59. The law is clear that, "when there has been a history of continuing infringement of a number of plaintiff's works and a significant threat of future infringement remains, a permanent injunction may apply" to all of the plaintiff's works. 5 NIMMER ON COPYRIGHT §14.06[C][2][c]. As TVEyes copies all of Fox's content and uses it in the same manner, the district court's injunction was warranted. *See Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996) ("The weight

of authority supports the extension of injunctive relief to future works."); *Olan Mills Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1349 (8th Cir. 1994) (injunction against future infringement warranted where "a threat of continuing infringement" exists); *Walt Disney Co. v. Powell*, 897 F.2d 565, 568 (D.C. Cir. 1990).[24]  To do otherwise would lead to the impractical result that Fox would need to bring separate infringement actions for each television program it produces.  Such a waste of judicial resources is not supported by copyright law.

## CONCLUSION

Fox requests that this Court hold that the Content-Delivery Features do not constitute fair use, reverse the district court's decisions that conflict with that holding, vacate the district court's advisory opinion, and deny all aspects of TVEyes' appeal.

Dated: June 15, 2016

*/s/ Dale Cendali*

Dale Cendali

KIRKLAND & ELLIS LLP

---

[24]  By contrast, in *Beastie Boys v. Monster Energy Co.*, the plaintiff could not "point[] to any other act of infringement, or evidence outside of the … [work-at-issue], that indicate[d] propensity by … [defendant] to infringe on others' [IP] rights generally or the rights of the … [plaintiff] specifically."  87 F. Supp. 3d 672, 681 (S.D.N.Y. 2015).  TVEyes' other cited cases do not involve copyrights.

## <u>CERTIFICATE OF TYPE-VOLUME COMPLIANCE</u>

The undersigned certifies that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 16,494 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

Dated: June 15, 2016

*/s/ Dale M. Cendali*

Dale M. Cendali
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900